2015 CO 35

**Cynthia H. COFFMAN, in her official capacity as Attorney General of the State of Colorado, and Julie Ann Meade, in her capacity as the Administrator, Uniform Debt-Management Services Act, Defendants–Appellants**

v.

**Lawrence W. WILLIAMSON, Jr., Esq.; Donald Drew Moore, Esq.; and Morgan Drexen, Inc., a California corporation, Plaintiffs–Appellees**

and

**Walter Joseph Ledda, Defendant–Appellee**

Supreme Court Case No. 14SA249

Supreme Court of Colorado.

May 26, 2015

930

Attorneys for Defendants–Appellants: Cynthia H. Coffman, Attorney General, Jeanine M. Anderson, Senior Assistant Attorney General, Denver, Colorado

Attorneys for Plaintiffs–Appellees Lawrence W. Williamson, Jr., Esq. and Donald Drew Moore, Esq.: Bryan Cave LLP, Stephen D. Gurr, Denver, Colorado

Attorneys for Plaintiff–Appellee Morgan Drexen, Inc. and Defendant–Appellee Walter Joseph Ledda: Brownstein Hyatt Farber Schreck, LLP, Jason R. Dunn, Denver, Colorado

JUSTICE HOOD, delivered the Opinion of the Court.

¶ 1 In this case, we examine the scope of the legal services exemption in the Uniform Debt–Management Services Act ("DMSA"). The DMSA protects consumers seeking concessions from creditors by regulating those who offer their services as intermediaries between creditors and debtors. The DMSA does not apply, however, to certain attorneys who provide "legal services" within an attorney–client relationship. This is referred to as the "legal services exemption." Morgan Drexen, Inc., a legal software and "legal support services" company consisting entirely of nonlawyers, invokes this legal services exemption based on its contracts with "engagement counsel," who receive a monthly fee as low as two dollars per month per debtor–client. In essence, we are tasked with determining whether Morgan Drexen's high-volume, low-dollar contracts with these attorneys improperly circumvent Colorado's regulation of debt-management services. We conclude they do.

¶ 2 We address several issues relating to two iterations of the legal services exemption. First, we decide whether the original version shields Morgan Drexen from regulation. In doing so, we examine Morgan Drexen's reliance on Colorado Rule of Professional Conduct 5.3, which sets forth an attorney's responsibilities toward nonlawyer assistants. Second, we address whether an amended version regulates attorneys and thus encroaches upon this court's exclusive authority to do so in violation of the Colorado Constitution. Third, we determine whether the amended version discriminates against out-of-state attorneys in violation of the United States Constitution.

¶ 3 We hold that the trial court erred by concluding that Morgan Drexen's services fall within the scope of the legal services exemption in the original DMSA. The original exemption encompasses nonlawyer assistants, but Morgan Drexen's activity here does not fall within the scope of that exemption. Morgan Drexen finds no safe harbor under Colo. RPC 5.3, given that it performs substantive debt-management services without meaningful instruction and supervision by an attorney. We also conclude the amended DMSA does not violate the separation of powers doctrine in article III of the Colorado Constitution or the Commerce and Privileges and Immunities Clauses of the United States Constitution. Consequently, we reverse the trial court's order and remand for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶ 4 Walter Ledda is the founder, Chief Executive Officer, and majority shareholder of Morgan Drexen. He describes Morgan Drexen as a "legal software and legal software development company" that is owned and operated by nonlawyers but provides paraprofessional and administrative support to attorneys and performs "routine tasks." Although Morgan Drexen alternates between calling itself a California and a Nevada corporation, its principal place of business is in California. Morgan Drexen employs what it

terms "nonlawyer assistants" and provides debt-management services nationwide in conjunction with contracting attorneys known as "engagement counsel" or "engagement law firms," some of whom then engage local counsel. Engagement counsel or local counsel enter into attorney–client fee agreements with debtors. Those fee agreements state that counsel may use the services of outside companies such as Morgan Drexen; however, Morgan Drexen is not a party to the agreements.

¶ 5 Morgan Drexen refers to engagement counsel as its "clients" and pays them a minimal fee that passes through the law firms' trust accounts, sometimes as low as two dollars per month per debtor–client. Two of those attorneys are parties to this lawsuit: Donald Drew Moore and Lawrence Williamson, Jr. Moore is a Colorado-licensed attorney who acts as both engagement counsel and local counsel. Williamson is a Kansas attorney who acts as engagement counsel and represents Colorado clients through association with Moore. Williamson is "authorized" (but not licensed) to practice law in Colorado as an out-of-state attorney under C.R.C.P. 205.1 (which replaced former C.R.C.P. 220 in 2014). Williamson submitted an affidavit to the trial court that characterizes Morgan Drexen's services as "back office, paralegal services" and avers that he (and Moore) "maintain full control over the course of the representation and exercise such control according to [their] independent judgment."

¶ 6 This action dates back to 2011 when the Administrator of the DMSA denied Morgan Drexen's application to become a registered debt-management services provider under the amended DMSA and issued a cease and desist order instructing Morgan Drexen to stop providing debt-management services to Colorado residents and collecting fees from them. Morgan Drexen, Moore, and Williamson then filed a complaint for a declaratory judgment, seeking a declaration that (1) they did not provide debt-management services under the original DMSA and (2) the amended DMSA is unconstitutional. The Colorado Attorney General and the Administrator answered and filed counter-

claims, alleging that Morgan Drexen and its Chief Executive Officer, Ledda, violated numerous provisions of the DMSA, §§ 12–14.5–201 to –242, C.R.S. (2014), and the Colorado Consumer Protection Act ("CCPA"), §§ 6–1–101 to –1121, C.R.S. (2014).

¶ 7 Before conducting any discovery, the State filed a motion for a determination of questions of law pursuant to C.R.C.P. 56(h). It sought a determination that (1) Morgan Drexen was a provider of debt-management services under the original DMSA and (2) the amended DMSA does not violate the separation of powers doctrine. Morgan Drexen and the named attorneys then filed a cross-motion under Rule 56(h), which raised related issues.

¶ 8 In a September 12, 2012 order, the trial court concluded that Morgan Drexen provided debt-management services to Colorado consumers based on the plain language of the original DMSA. Nevertheless, the trial court held that Morgan Drexen was exempt from regulation under the legal services exemption of the original DMSA for three reasons. First, the services that Morgan Drexen performed (particularly soliciting settlement offers on behalf of attorneys' clients) were "legal services" because Morgan Drexen is a nonemployee, nonlawyer assistant retained by or associated with a lawyer as permitted under Colo. RPC 5.3. Second, those services were provided in an attorney–client relationship because "the attorneys enter into fee agreements with their debtor clients, and the fee agreements specifically reference Morgan Drexen as an intermediary." And third, those services were provided by an attorney licensed or otherwise authorized to practice law in Colorado because Morgan Drexen was "acting under the supervision of attorneys, as contemplated by" Colo. RPC 5.3.

¶ 9 With respect to the statute's constitutionality, the trial court held that the amended DMSA violates the separation of powers doctrine of article III of the Colorado Constitution because (1) it regulates attorneys who are not licensed but are otherwise authorized to practice law in Colorado and (2) it regulates nonemployee, nonlawyer assistants in conflict with Colo. RPC 5.3. In addition, the trial court held that the amend-

ed DMSA burdens interstate commerce and puts out-of-state attorneys at a competitive disadvantage in violation of the federal Commerce Clause. Finally, the trial court held that the amended DMSA violates the federal Privileges and Immunities Clause because residency "is necessarily at issue in the determination of whether an attorney will be subjected to" the DMSA's requirements.

¶ 10 The trial court entered final judgment for Morgan Drexen, Moore, and Williamson. The State appealed. The court of appeals referred the case to us under section 13–4–110(1)(a), C.R.S. (2014), because it does not have initial jurisdiction over appeals in cases in which a statute has been declared unconstitutional. *See* § 13–4–102(1)(b), C.R.S. (2014).

## II. Standard of Review

¶ 11 C.R.C.P. 56(h) allows a party to move for a "determination of a question of law." *See generally In re Bd. of Cnty. Comm'rs v. United States*, 891 P.2d 952, 963 n. 14 (Colo. 1995) (explaining that the purpose of Rule 56(h) is " 'to allow the court to address issues of law which are not dispositive of a claim (thus warranting summary judgment) but which nonetheless will have a significant impact upon the manner in which the litigation proceeds' " so as to " 'enhance the ability of the parties to prepare for and realistically evaluate their cases ... and allow the parties and the court to eliminate significant uncertainties on the basis of briefs and argument' " (quoting 5 Robert Hardaway & Sheila Hyatt, *Colorado Civil Rules Annotated* § 56.9 (1985))).

¶ 12 A trial court's order deciding a question of law under Rule 56(h) is subject to de novo review. *Henisse v. First Transit, Inc.*, 247 P.3d 577, 579 (Colo.2011). The summary judgment standard applies: an order is proper under Rule 56(h) "[i]f there is no genuine issue of any material fact necessary for the determination of the question of law." C.R.C.P. 56(h). The nonmoving party is entitled to all favorable inferences from the undisputed facts, and all doubts as to the existence of a triable issue of fact must be resolved against the moving party. *See Henisse*, 247 P.3d at 579.

¶ 13 The constitutionality of a statute is also a question of law subject to de novo review. *E–470 Pub. Highway Auth. v. Revenig*, 91 P.3d 1038, 1041 (Colo.2004). Because "declaring a statute unconstitutional is one of the gravest duties impressed upon the courts," a court must presume that a statute is constitutional unless the party challenging it proves its unconstitutionality beyond a reasonable doubt. *City of Greenwood Vill. v. Petitioners for the Proposed City of Centennial*, 3 P.3d 427, 440 (Colo.2000). "Further, we must uphold the constitutionality of a statute unless a 'clear and unmistakable' conflict exists between the statute and a provision of the Colorado Constitution." *E–470 Pub. Highway Auth.*, 91 P.3d at 1041 (quoting *Greenwood Vill.*, 3 P.3d at 440); *see also People ex rel. Dunbar v. Gym of Am., Inc.*, 177 Colo. 97, 493 P.2d 660, 665 (1972) ("Not only, then, does appellee have a heavy burden to overcome with respect to [the CCPA's] alleged unconstitutionality, especially in light of its particular subject matter, but also this Court has an equally certain duty to construe the statute in such a way that it is not void for vagueness whenever a reasonable and practical construction can be given to its language.").

## III. Analysis

¶ 14 Following a brief overview of the DMSA, we trace the evolution of the legal services exemption for debt-management providers. We then apply the exemption as it existed in the original DMSA to determine whether Morgan Drexen, a nonlawyer, avoids the DMSA's regulatory scheme by associating with attorneys, as it has here. After we evaluate the exemption as originally drafted, we turn our attention to the constitutionality of the amended DMSA. We assess whether the current version of the DMSA encroaches upon this court's authority to regulate attorneys in violation of the separation of powers doctrine of our state constitution and whether it favors in-state lawyers in violation of the Commerce Clause and the Privileges and Immunities Clause of the federal constitution.

## A. The DMSA

¶ 15 In 2007, the General Assembly enacted the DMSA to regulate companies that offer and provide debt-management services to Colorado residents and to protect those consumers from unscrupulous debt-management providers; it became effective on January 1, 2008 and was amended in 2011 and 2013. *See* §§ 12–14.5–201 to –242. The DMSA was modeled after the Uniform Debt-Management Services Act ("UDMSA"), which the National Conference of Commissioners on Uniform State Laws issued in July 2005.[1] The DMSA contains a comprehensive regulatory scheme that requires those who provide (or offer or agree to provide) debt-management services, directly or through others, to apply for registration with the Administrator and, if approved, to comply with detailed requirements. *See generally* §§ 12–14.5–201 to –242.

¶ 16 To apply, a prospective provider must pay a fee, file a surety bond, identify its trust account and sign an irrevocable consent form authorizing the Administrator to review the account, and submit documentation proving it complies with Colorado's statutory business requirements. § 12–14.5–205. The application must include detailed information on topics such as the applicant's business names, the jurisdictions in which its officers and directors are licensed or registered to provide debt-management services and in which its clients reside, any litigation or enforcement actions pending against the applicant, and any ownership interests in related entities. § 12–14.5–206. The application must also include documents such as audited financial statements, client education program materials, client agreements, a schedule of fees and charges, the results of a criminal records check for all employees or agents with access to the trust account, and compensation statements for the applicant's five most highly compensated employees for the past three years. *Id.* Much of this information becomes available to the public. *See* § 12–14.5–208.

¶ 17 The Administrator has discretion to issue or deny registration. § 12–14.5–209. If the application is approved, the provider is subject to extensive regulation that controls most aspects of the debt-management services relationship. For instance, the provider must give specific disclosures to a potential client before performing any services. *See, e.g.,* §§ 12–14.5–217 to –218. Agreements with consumers must satisfy detailed requirements. *See* §§ 12–14.5–219 to –220. Trust accounts, the fees that a provider may charge, and the circumstances under which a provider can terminate an agreement are also subject to regulation. *See* §§ 12–14.5–222 to –226.

¶ 18 The Administrator maintains regulatory oversight, including the right to examine accounts and books. § 12–14.5–232. The Administrator can enforce compliance with the DMSA by ordering the violators to cease and desist, prosecuting a civil action, and recovering restitution or civil penalties. § 12–14.5–233. The Administrator can also suspend, revoke, or refuse to renew a provider's registration. § 12–14.5–234.

¶ 19 The DMSA defines "debt-management services" to mean "services as an intermediary between an individual and one or more creditors of the individual for the purpose of obtaining concessions." § 12–14.5–202(10)(A). However, it specifically excludes some legal, accounting, and representative services from this definition. *See* § 12–14.5–202(10)(A)(i)–(iii). This case centers on the legal services exemption, the terms of which have evolved since the DMSA's inception.

## B. Evolution of the Legal Services Exemption

¶ 20 In the original DMSA, the General Assembly exempted from the Act's regulatory scope "[l]egal services provided in an attorney–client relationship by an attorney licensed or otherwise authorized to practice law in this state." § 12–14.5–202(10)(A), C.R.S. (2008).

¶ 21 When the legislature amended the DMSA in 2011, it narrowed the legal services exemption in two ways. First, it deleted the

---

1. The UDMSA was the first national effort to provide uniform rules to govern both consumer credit counseling services and debt settlement services. *See* Uniform Debt–Management Services Act, Official Informational Website, http://www.udmsa.org (last visited May 20, 2015).

phrase "or otherwise authorized." An attorney must now be licensed in Colorado to claim the legal services exemption:

> "Debt-management services" means services as an intermediary between an individual and one or more creditors of the individual for the purpose of obtaining concessions, but does not include: (i) �devel Legal services provided in an attorney–client relationship by an attorney licensed to practice law in this state. : . .

§ 12–14.5–202(10)(A)(i), C.R.S. (2011). Second, the General Assembly added a provision to limit the legal services exemption to employees of the licensed attorney:

> The exemptions in subparagraph (A) of this paragraph (10) do not apply to any person who directly or indirectly provides any debt management services on behalf of a licensed attorney ... *if that person is not an employee of the licensed attorney....*

§ 12–14.5–202(10)(B), C.R.S. (2011) (emphasis added). Both changes remain. *See* § 12–14.5–202(10)(A)(i), (B), C.R.S. (2014).[2]

¶ 22 With this context in mind, we consider the language of the legal services exemption, as originally drafted, and assess whether Morgan Drexen, a company of nonlawyers that contracts with lawyers to provide legal software and "support" for debt-management services, is exempt from regulation.

## C. Application of the Legal Services Exemption in the Original DMSA to Morgan Drexen

■■■ ¶ 23 Our task is to ascertain and give effect to the General Assembly's intent. *Nowak v. Suthers,* 2014 CO 14, ¶ 20, 320 P.3d 340, 344. If statutory language is clear, we interpret it according to its plain and ordinary meaning. *Specialty Rests. Corp. v. Nelson,* 231 P.3d 393, 397 (Colo.2010). If, however, statutory language is "reasonably

susceptible to multiple interpretations, it is ambiguous and we determine the proper construction by examining the legislative intent, the circumstances surrounding its adoption, and possible consequences of various constructions." *Williams v. Kunau,* 147 P.3d 33, 36 (Colo.2006); *see also Bostelman v. People,* 162 P.3d 686, 690 (Colo.2007) (explaining that if statutory language is ambiguous "we may consider other aids to statutory construction, such as the consequences of a given construction, the end to be achieved by the statute, and legislative history").

### 1. Ambiguous Exemption Language

¶ 24 The original DMSA exempts from regulation "[l]egal services provided in an attorney–client relationship by an attorney licensed or otherwise authorized to practice law in this state." § 12–14.5–202(10)(A), C.R.S. (2008). The exemption therefore contains three separate legal components. First, the debt-management services provider must be "an attorney licensed or otherwise authorized to practice law in this state." Second, the attorney must provide "legal services" (and services cannot constitute "legal services" unless the person performing them is authorized to practice law, as explained elsewhere in the DMSA).[3] And third, the attorney must provide those services "in an attorney–client relationship."

¶ 25 As used in the exemption, the scope of the term "attorney" is "reasonably susceptible to multiple interpretations." On the one hand, these three legal components arguably signify that the exemption applies only where the provider is an attorney. On the other hand, some ambiguity exists as to whether the exemption also encompasses nonlawyer assistants, such as paralegals, secretaries, and administrative assistants. Because the exemption covers "legal services" as a whole, it arguably extends to some services performed *on behalf of* an attorney.[4] We must

---

**2.** Subparagraphs 12–14.5–202(10)(A) and (B) were amended further in 2013, but those amendments relate to a different exemption and thus are not relevant to this case. *See* § 12–14.5–202(10)(A), (B), C.R.S. (2014).

**3.** *See* § 12–14.5–228(b)(8), C.R.S. (2014) (noting that a provider may not, directly or indirectly, "[f]urnish legal advice or perform legal services,

unless the person furnishing that advice to or performing those services for the individual is licensed to practice law").

**4.** We note that the amended DMSA eliminates this ambiguity: section 12–14.5–202(10)(B) makes clear that the exemption can apply to both attorneys and "any person who directly or indirectly provides any debt management services on

therefore turn to extrinsic aids to statutory construction to ascertain legislative intent.

### 2. Statutory Construction Aids Support Exemption Coverage for Some Nonlawyers

¶ 26 Legislative history supports the interpretation that the legal services exemption in the original DMSA can apply to nonlawyers. During the March 21, 2011 Senate Committee hearing on that year's amendments, Administrator Udis stated that an "important part" of the 2011 amendment was to *"tighten up* the exemption ... to make it very clear that the exemption applies only to attorneys ... but not to third parties that may be involved in the process but are not themselves attorneys." *Hearing on H.B. 11–1206 Before the S. Judiciary Comm.,* 68th Gen. Assemb., 1st Sess. 5–7 (Colo. 2011) (statement of Administrator Laura Udis) (emphasis added). This statement suggests that exemption coverage under the original DMSA *does* extend to "third parties that may be involved in the process but are not themselves attorneys."

¶ 27 This interpretation also comports with the well-established notion that attorneys often rely on nonlawyer assistants—a reality that is reflected in Supreme Court precedent, Colorado's attorney–client privilege statute, and Colo. RPC 5.3.

¶ 28 The United States Supreme Court observed in the context of an application for attorneys' fees under 42 U.S.C. § 1988 that attorneys often use nonlawyer personnel to carry out tasks under attorney supervision:

> It has frequently been recognized in the lower courts that paralegals are capable of carrying out many tasks, *under the supervision of an attorney,* that might otherwise be performed by a lawyer and billed at a higher rate. Such work might include, for example, factual investigation, including locating and interviewing witnesses; assistance with depositions, interrogatories, and document production; compilation of statistical and financial data; checking legal citations; and drafting correspondence.

Much such work lies in a gray area of tasks that might appropriately be performed either by an attorney or a paralegal.

*Missouri v. Jenkins by Agyei,* 491 U.S. 274, 288 n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (emphasis added); *see also Zimmerman v. Mahaska Bottling Co.,* 270 Kan. 810, 19 P.3d 784, 790 (2001) (noting, in applying ethical rules to nonlawyers, that "[n]onlawyer personnel are widely used by lawyers *to assist* in rendering legal services" (emphasis added) (internal quotation marks omitted)).

¶ 29 In addition, Colorado's statutory protection of attorney–client communications implicitly acknowledges that nonlawyer personnel routinely work on behalf of attorneys:

> An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment; *nor shall an attorney's secretary, paralegal, legal assistant, stenographer, or clerk be examined without the consent of his employer concerning any fact, the knowledge of which he has acquired in such capacity.*

§ 13–90–107(b), C.R.S. (2014) (emphasis added); *accord Wal-Mart Stores, Inc. v. Dickinson,* 29 S.W.3d 796, 804 (Ky.2000) (finding that the attorney–client privilege extends to paralegals because "[a] reality of the practice of law today is that attorneys make extensive use of nonattorney personnel, such as paralegals, to assist them in rendering legal services").

¶ 30 Finally, Colorado's Rules of Professional Conduct implicitly approve of this practice. Rule 5.3 outlines an attorney's "responsibilities regarding nonlawyer assistants." *See* Colo. RPC 5.3; *see also id.* cmt. 1 (espousing the basic, and uncontested, principle that "[l]awyers generally employ assistants in their practice, including secretaries, investigators, law student interns, and paraprofessionals").

▮ ¶ 31 Given that attorney use of nonlawyer assistants is commonplace, we decline

---

behalf of a licensed attorney" provided that person is an employee of the attorney. § 12–14.5–202(10)(B). Thus, the analysis within Section

III.C of this opinion speaks only to the original exemption.

the State's invitation to categorically preclude nonlawyer assistants from coverage under the legal services exemption. But that does not mean, conversely, that coverage is categorically extended to nonlawyer assistants. At a minimum, the person seeking an exemption must work for the attorney—in substance, not just in name—and under the attorney's supervision. With this thought in mind, we turn to Morgan Drexen's contention that its services fall within the exemption because it acts *on behalf of* lawyers as a "nonlawyer assistant" within the confines of Colo. RPC 5.3.

### 3. Colo. RPC 5.3 Does Not Allow Morgan Drexen to Claim Exemption as a "Nonlawyer Assistant"

¶ 32 Though Colo. RPC 5.3 does reflect the common use of nonlawyer assistants in the legal world, Morgan Drexen's attempt to evade regulation through an expansive interpretation of the rule is unavailing for several reasons.

¶ 33 First, the DMSA is a remedial statute enacted to protect consumers, and we must construe it liberally to effectuate that purpose. *See, e.g., Shapiro & Meinhold v. Zartman*, 823 P.2d 120, 124 (Colo. 1992) (stating that the Fair Debt Collection Practices Act "should be construed liberally because its purposes are remedial"). Likewise, we must apply its exemptions narrowly so as not to frustrate the DMSA's remedial purposes. *See Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 53 (Colo. 2001) (explaining that "in determining whether conduct falls within the purview · of the CCPA, it should ordinarily be assumed that the CCPA applies to the conduct" so as not to frustrate the CCPA's "strong and sweeping remedial purposes"); *see also In re Gentry*, 463 B.R. 526, 531 (Bankr.D.Colo.2011) ("[E]xceptions to remedial legislation should be construed narrowly."). Applying these principles, the remedial nature of the DMSA militates in favor of a narrow construction of Rule 5.3 in this context.[5]

¶ 34 Second, Rule 5.3 does not purport to establish who *qualifies* as a nonlawyer assistant; rather, it sets forth an attorney's professional responsibilities toward "nonlawyers employed or retained by or associated with a lawyer." Colo. RPC 5.3.[6]

¶ 35 Third, even assuming Rule 5.3 applies, Morgan Drexen's actions place it outside the rule's parameters. While those parameters may be somewhat nebulous at the outer margins, the Rule clearly contemplates meaningful instruction and supervision. Here, such instruction and supervision is conspicuously absent. Morgan Drexen requires its engagement counsel to execute carefully crafted contracts, which portray

---

**5.** The comments to the UDMSA, on which the DMSA was based, even state that the statute's remedial nature mandates vigilance by courts and the Administrator to ensure that persons who meet the definition of a "provider" of debt-management services do not attempt "to evade compliance with the Act by creating a sham relationship between its customers and an attorney." UDMSA, § 2 cmt. 10 (2011); *see also id.* (stating that the exclusion is not applicable "merely because the individual speaks to or enters a nominal agreement with an attorney, if the real intermediary between the individual and the creditors is a person other than the attorney" and that "[m]ere contact with an attorney or an attorney's office does not suffice").

**6.** The rule provides:

> With respect to nonlawyers employed or retained by or associated with a lawyer:
> (a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
> (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:
> (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
> (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Morgan Drexen as subordinate to the law firms and acting under an attorney's supervision when it comes to legal matters. But the substance of their relationship reveals that "the tail wags the dog." Even the limited record before us now demonstrates that Morgan Drexen is not acting for the lawyer in rendition of the lawyer's professional services; rather, the lawyer is acting for Morgan Drexen.

¶ 36 This court's function under Rule 56 is not to decide issues of fact but rather to determine "whether there is an issue of fact to be tried" and, if not, to resolve the question raised as a matter of law. *Morlan v. Durland Trust Co.*, 127 Colo. 5, 252 P.2d 98, 100 (1952) (internal quotation marks omitted). Exercising de novo review, we conclude that no genuine issue of fact exists as to the lack of supervision by engagement counsel over Morgan Drexen, despite Williamson's affidavit that he and Moore "direct and supervise the services [they] outsource to Morgan Drexen to perform" and "maintain full control over the course of the representation and exercise such control according to [their] own independent judgment." As detailed below, the overwhelming evidence in the record shows the opposite.

¶ 37 A litigant "cannot avoid a summary disposition of his case" "by merely asserting a fact, without any evidence to support it." *Norton v. Dartmouth Skis, Inc.*, 147 Colo. 436, 364 P.2d 866, 868 (Colo.1961) (internal quotation marks omitted); *see also Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir.2004) ("[U]nsupported, conclusory allegations ... do not create a genuine issue of fact." (internal quotation marks omitted)); *Bernard v. Grp. Publ'g, Inc.*, 970 F.Supp.2d 1206, 1213 (D.Colo.2013) (explaining that unsubstantiated, self-serving testimony in an affidavit does not create a genuine issue of material fact for summary judgment purposes where the record does not contain corroborating evidence). *See generally* C.R.C.P. 56(e) ("[A]n adverse party may not rest upon the mere allegations or denials of the opposing party's pleadings, but the opposing party's response by affidavits or otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial.").

¶ 38 The subordinate nature of the attorneys' relationship is reflected in the payment arrangement: engagement counsel receives minimal fees—as low as two dollars per month per debtor–client. It is also reflected in the documents that define and govern the relationship between Morgan Drexen and engagement counsel. For example, those documents reveal:

- Morgan Drexen "coordinates" the attorneys' efforts to negotiate with creditors on behalf of clients and to offer budget-planning services to clients.

- Morgan Drexen maintains "the right to change the method, manor [sic] of, and procedures for servicing clients from time-to-time" without the attorneys' approval.

- Morgan Drexen prepares advertisements to promote debt-management programs for engagement counsel, approves business names to be used by engagement counsel to ensure the names comply with applicable law, places advertisements in media, and performs screening and client intake services.

- Morgan Drexen provides engagement counsel with a representative "unsecured debt negotiation/settlement attorney/client fee agreement," sample correspondence for creditors (which it describes as "pre-approved" by an attorney), and sample correspondence for clients, including a letter offering to assist with legal representation if debtors are sued.

- Morgan Drexen specifically directs that both the creditors and the attorneys' clients contact Morgan Drexen alone.[7]

- Sample settlement agreements in the record are on Morgan Drexen's letterhead.

*Id.*

---

7. Morgan Drexen's "debt negotiation program" packet tells debtors to "[r]efer creditors who may

call to Morgan Drexen's Creditor Relations Department." Its phone conversation log, which provides debtors with a script of how to respond to phone calls from creditors, tells debtors "just

- Morgan Drexen sets out a fee schedule that details what engagement counsel can charge if a client engages the attorney separately (including fees for preparation of pleadings, discovery responses, and summary judgment responses).
- If engagement counsel terminates its relationship with Morgan Drexen but maintains a debtor–client, it must pay Morgan Drexen $1100 per client.

In sum, the record shows that the attorneys do not provide meaningful instruction and supervision to Morgan Drexen.[8] Thus, Morgan Drexen does not qualify for the legal services exemption.

### D. Separation of Powers

¶ 39 Having concluded that the trial court erred in finding that Morgan Drexen falls within the legal services exemption in the original DMSA, we now shift our attention to the amended DMSA. We examine whether the amended DMSA improperly regulates certain out-of-state attorneys in violation of the separation of powers doctrine.[9] It does not.

¶ 40 As explained above, the 2011 amendments to the DMSA narrowed the legal ser-

vices exemption such that (1) an attorney must now be licensed in Colorado to claim it and (2) those who directly or indirectly provide debt-management services on behalf of the licensed attorney are exempt only if they are employees of that attorney. See § 12–14.5–202(10)(A)(i), (B). The trial court held that these amendments violate the separation of powers doctrine because the DMSA now regulates attorneys who are not licensed but are otherwise authorized to practice law in our state, as well as attorneys' nonemployee, nonlawyer assistants. We disagree.

¶ 41 Under most circumstances, the amended DMSA does not even implicate the separation of powers doctrine. This is because it does not regulate out-of-state attorneys who fall within the parameters of C.R.C.P. 205.1. Under this rule, an out-of-state attorney who is authorized but not licensed to practice law in Colorado nevertheless "shall be deemed to have obtained a license for the limited scope of practice specified in" the rule. See C.R.C.P. 205.1(2).[10] Stated otherwise, an attorney who is not licensed in Colorado but follows the rules governing out-of-state attorneys can qualify for the legal services exemption.[11]

---

record it on the call log and we will deal with the creditor."

8. We are not the first court to conclude that Morgan Drexen's business model overstates the involvement and supervision of attorneys in its debt-management practice. See, e.g., State v. Morgan Drexen, Inc., No. 11–C–829, at 35, 41–42 (Kanawha Cnty. Cir. Court W. Va. July 15, 2014) (final order) (referring to the "ruse perpetrated by Morgan Drexen" and declining to apply the exemption for "licensed attorneys" to a statute that prohibits charges for debt pooling because "Morgan Drexen dictated and controlled attorneys' interactions with Morgan Drexen customers," "[t]he bulk of Morgan Drexen's services are not completed by lawyers or by the direction of lawyers," and "it is evident that Morgan Drexen hides behind attorneys who perform or complete little to no work, exert little to no control over Morgan Drexen, and play little to no role in Morgan Drexen's debt settlement negotiations"); Morgan Drexen, Inc. v. Wis. Dep't of Fin. Insts., 361 Wis.2d 271, 862 N.W.2d 329, 334 & n. 2 (Wis. Ct. App. 2015) (upholding an order requiring Morgan Drexen to disgorge over $4.25 million it acquired by operating as an unlicensed adjustment service company under Wis. Stat. § 218.02(1)(a) and to pay a $1.89 million forfeiture and deferring to the hearing examiner's finding that Morgan Drexen, through Ledda,

"was not credible in its representations about its fees and relationship with local counsel").

9. We consider whether the amended DMSA's regulation of certain out-of-state attorneys violates the state and federal constitutions despite the State's standing challenge. Even though Williamson works through local counsel, does not himself provide services to Colorado consumers, and has never sought an exemption, regulations governing out-of-state attorneys affect his options and ability to practice this area of the law, thus satisfying the injury-in-fact requirement.

10. In 2014, this rule replaced former C.R.C.P. 220(4), which contained more restrictive language: "An out-of-state attorney who engages in the practice of law in Colorado pursuant to Rule 220 shall be deemed, *for the purposes of Colorado Revised Statutes, Title 12, Article 5, Sections 101, 112, and 115*, to have obtained a license for the limited scope of practice specified in this rule." (Emphasis added.)

11. Rule 205.1(1) defines an "out-of-state attorney" as an attorney who "is licensed to practice law and is on active status in another jurisdiction in the United States"; "is a member in good standing of the bar of all courts and jurisdictions in which he or she is admitted to practice"; "has

¶ 42 The exemption is not triggered, though, solely because a provider is a licensed attorney. Rather, an attorney licensed to practice law in Colorado *must provide legal services* in an *attorney–client relationship. See State v. Johnson Law Grp.*, No. 09CV10889, at 5 (Denver Dist. Court Apr. 26, S2010) (Hoffman, J.) (order denying motion to dismiss) (noting that attorneys are not categorically protected by the legal services exemption if they outsource work on debt-management services to an unlicensed agent and do not provide legal services). Williamson does not satisfy those other requisites, making him an example of how an out-of-state attorney can be subject to regulation under the amended DMSA in certain limited situations and necessitating a brief separation of powers analysis.

¶ 43 Article III of the Colorado Constitution provides:

> The powers of the government of this state are divided into three distinct departments,—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.

Colo. Const. art. III. The resulting separation of powers doctrine "prevents one branch of government from exercising powers that the constitution makes the exclusive domain of another branch." *Crowe v. Tull,* 126 P.3d 196, 205 (Colo.2006).

¶ 44 The regulation of attorneys is within this court's exclusive domain: "Article VI of the Colorado Constitution grants the Colorado Supreme Court jurisdiction to regulate and control the practice of law in Colorado." *Unauthorized Practice of Law Comm. v. Grimes,* 654 P.2d 822, 823 (Colo. 1982) (citing *Conway–Bogue Realty Inv. Co. v. Denver Bar Ass'n,* 135 Colo. 398, 312 P.2d 998 (1957)); *see also* C.R.C.P. 202.1 ("The Supreme Court exercises jurisdiction over all matters involving the licensing and regulation of those persons who practice law in Colorado. Accordingly, the Supreme Court has adopted the following rules governing admission to the practice of law in Colorado.").

¶ 45 As we stated in *Crowe,* the separation of powers doctrine does not require "a complete division of authority among the three branches" because "the powers exercised by different branches of government necessarily overlap." *Crowe,* 126 P.3d at 205–06 (internal quotation marks omitted). As long as the legislation in question does not create "a substantial conflict," "some overlap between judicial rulemaking and legislative policy is constitutionally permissible." *Id.* at 206; *see also id.* (evaluating whether a "manifest inconsistency" exists). There is no substantial conflict here.

¶ 46 To evaluate whether a conflict exists, we consider what it means to regulate attorneys. This court's regulatory authority includes determining rules on bar admission, attorney discipline, and license revocation. *Id.* (citing *Colo. Supreme Court Grievance Comm. v. Dist. Court,* 850 P.2d 150, 152 (Colo.1993)). Limited regulation of attorneys within the DMSA implicates none of these areas. A division of our court of appeals recently rejected a similar challenge to the original DMSA. *See State ex rel. Suthers v. Johnson Law Grp., PLLC,* 2014 COA 150, ¶ 21, 350 P.3d 961 (explaining that "assertion of a claim against attorneys under the DMSA does not automatically present a separation of powers problem" because an attorney can be liable for violating a statute enacted by the General Assembly if that statute does not interfere with this court's " 'exclusive right to determine the rules governing admission to the bar or under which attorneys [are] disciplined' " (quoting *Crowe,* 126 P.3d at 206)),

not established domicile in Colorado"; and "has not established a place for the regular practice of law in Colorado from which the attorney holds himself or herself out to the public as practicing Colorado law or solicits or accepts Colorado clients." C.R.C.P. 205.1(1). Rule 205.1(2) allows an out-of-state attorney to practice law in Colorado, with or without associating with a Colorado attorney, so long as that attorney does not appear in any state court of record or before any administrative tribunal without first fulfilling pro hac vice admission requirements.

*cert. denied,* No. 14SC972, 2015 WL 3381201 (Colo. May 26, 2015).[12]

¶ 47 Furthermore, this court's regulation of attorneys and the DMSA share common objectives: both are designed to protect the public. *Cf. Crowe,* 126 P.3d at 206, 208 (holding that prosecution of attorneys for deceptive trade practices under the CCPA does not violate the separation of powers doctrine because "[a]pplied to attorneys, the CCPA complements, rather than contradicts, this court's implementation of the professional rules and can not be seen as impinging in any real sense upon our further right to discipline those licensed by us to practice law" (internal quotation marks omitted)).

¶ 48 Likewise, regulation of nonlawyer assistants who provide debt-management services on behalf of licensed attorneys, but are not employees of such attorneys, does not violate the separation of powers doctrine. The trial court determined that this regulation limits the attorneys' "right" to associate with nonemployee, nonlawyer assistants in conflict with Colo. RPC 5.3 and "hinder[s] ... their ability to provide adequate debt-management services all together." As established above though, Morgan Drexen is not a "nonlawyer assistant" as contemplated by Rule 5.3, given the wide scope of the debt-management services it performs with little or no meaningful instruction and supervision by attorneys.

¶ 49 For these reasons, the trial court erred in concluding that the amended DMSA violates the separation of powers doctrine of the Colorado Constitution.

## E. Commerce Clause and Privileges and Immunities Clause

¶ 50 Last, we consider whether the amended DMSA violates the Commerce Clause or the Privileges and Immunities Clause of the United States Constitution because it treats out-of-state attorneys differ-ently from attorneys who are Colorado residents. We conclude that it does not.

¶ 51 The Commerce Clause provides that "[t]he Congress shall have power ... [t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. It "prohibits economic protectionism—that is, regulatory measures designed to benefit instate economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988). "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *see, e.g., Thorpe v. State,* 107 P.3d 1064, 1072–73 (Colo.App.2004) (finding no Commerce Clause violation where statutes provided a sales tax refund to full-year state residents but not part-year state residents or nonresidents because statutes had only an incidental burden on interstate commerce and did not limit or restrict the ability to access Colorado markets).

¶ 52 The Privileges and Immunities Clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1; *see, e.g., United Bldg. & Constr. Trades Council v. Mayor & Council,* 465 U.S. 208, 218, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) (explaining that the Privileges and Immunities Clause prohibits discrimination on the basis of residency). The practice of law falls within the ambit of this clause. *See Supreme Court of N.H. v. Piper,* 470 U.S. 274, 279–81, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985) (holding that the New Hampshire Supreme Court's ruling that

---

12. Likewise, other federal and state courts have upheld consumer protection statutes in the face of challenges that they violate the separation of powers doctrine by regulating attorneys. *See, e.g., In re Kinderknecht,* 470 B.R. 149, 183–84 (Bankr.D.Kan.2012) (upholding the Kansas Credit Services Organization Act and the Kansas Consumer Protection Act); *Newman v. Checkrite Cal.,* *Inc.,* 912 F.Supp. 1354, 1365–66 (E.D.Cal.1995) (upholding the federal Fair Debt Collection Practices Act); *Heslin v. Conn. Law Clinic of Trantolo & Trantolo,* 190 Conn. 510, 461 A.2d 938, 945–46 (1983) (upholding Connecticut's Unfair Trade Practices Act); *Hays v. Ruther,* 298 Kan. 402, 313 P.3d 782, 787–89 (2013) (upholding the Kansas Consumer Protection Act).

limited bar admission to state residents violated the Privileges and Immunities Clause). But the Privileges and Immunities Clause "is not an absolute." *Toomer v. Witsell,* 334 U.S. 385, 396, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). "It [bars] discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States," but not "disparity of treatment in the many situations where there are perfectly valid independent reasons for it." *Id.*

¶ 53 The DMSA does not implicate either constitutional concern. As explained above, under C.R.C.P. 205.1(2), an out-of-state attorney who satisfies the rule's requirements can be "an attorney licensed to practice law in this state" and thus exempt from regulation under the amended DMSA. In addition, the amended DMSA is facially neutral. It does not differentiate between attorneys on the basis of residency because Colorado law licenses do not depend on residency. An out-of-state, nonresident attorney can apply for a license to practice law in Colorado, provided that the attorney has not been disbarred or suspended in another jurisdiction.[13] Finally, any burden on out-of-state attorneys who want to practice in this area is incidental. They can still conduct debt-management services, provided that they comply with the DMSA or associate with a local attorney and satisfy the pro hac vice requirements to appear before a court. *See* C.R.C.P. 205.1, 205.3.

¶ 54 Because the amended DMSA does not benefit in-state economic interests by burdening out-of-state competitors or otherwise favor residents over nonresidents, it does not violate the Commerce Clause or the Privileges and Immunities Clause of the United States Constitution.

## IV. Conclusion

¶ 55 We hold that the trial court erred by concluding that Morgan Drexen's services fall within the scope of the legal services

exemption in the original DMSA. The original exemption encompasses nonlawyer assistants, but Morgan Drexen's activity here does not fall within the scope of that exemption. Morgan Drexen finds no safe harbor under Colo. RPC 5.3, given that it performs substantive debt-management services without meaningful instruction and supervision by an attorney. We also conclude the amended DMSA does not violate the separation of powers doctrine in article III of the Colorado Constitution or the Commerce and Privileges and Immunities Clauses of the United States Constitution. Consequently, we reverse the trial court's order and remand for further proceedings consistent with this opinion.

---

13. *See* C.R.C.P. 203.1 (setting forth general provisions for applications for a Colorado license to practice law); C.R.C.P. 203.2 (allowing qualified out-of-state attorneys to apply for admission on motion); C.R.C.P. 203.3 (allowing qualified applicants to apply for admission based on Uniform Bar Examination scores, with no residency restrictions); C.R.C.P. 203.4 (allowing qualified applicants to apply for admission by taking and passing the Colorado Bar Examination, with no residency restrictions).