Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
January 14, 2019

**2019 CO 3**

**No. 17SC297, *COGCC v. Martinez* — Administrative Law and Procedure — Mines and Minerals.**

This case requires the court to decide whether, in accordance with the Colorado Oil and Gas Conservation Act (the "Act"), section 34-60-102(1)(a)(I), C.R.S. (2018), the Colorado Oil and Gas Conservation Commission (the "Commission") properly declined to engage in rulemaking to consider a rule proposed by Respondents.

Respondents proposed a rule that, among other things, would have precluded the Commission from issuing any permits for the drilling of an oil and gas well "unless the best available science demonstrates, and an independent, third-party organization confirms, that drilling can occur in a manner that does not cumulatively, with other actions, impair Colorado's atmosphere, water, wildlife, and land resources, does not adversely impact human health, and does not contribute to climate change."

After soliciting and receiving public comment and allowing interested parties to be heard, the Commission declined to engage in rulemaking to consider this proposed rule because, among other things, (1) the rule would have required the Commission to readjust the balance purportedly crafted by the General Assembly under the Act and

conditioned new oil and gas drilling on a finding of no cumulative adverse impacts, both of which the Commission believed to be beyond its statutory authority, and (2) the Commission was already working with the Colorado Department of Public Health and Environment ("CDPHE") to address the concerns to which the rule was directed and other Commission priorities took precedence over the proposed rulemaking at this time. The Denver District Court upheld the Commission's decision, but in a split, published decision, a division of the Court of Appeals reversed the district court's order. *Martinez v. Colo. Oil & Gas Conservation Comm'n*, 2017 COA 37, __ P.3d __.

The supreme court now reverses the division's judgment and concludes that the Commission properly declined to engage in rulemaking to consider Respondents' proposed rule. The court reaches this conclusion for three primary reasons. First, a court's review of an administrative agency's decision as to whether to engage in rulemaking is limited and highly deferential. Second, the Commission correctly determined that, under the applicable language of the Act, it could not properly adopt the rule proposed by Respondents. Specifically, as the Commission recognized, the pertinent provisions do not allow it to condition all new oil and gas development on a finding of no cumulative adverse impacts to public health and the environment. Rather, the provisions make clear that the Commission is required (1) to foster the development of oil and gas resources, protecting and enforcing the rights of owners and producers, and (2) in doing so, to prevent and mitigate significant adverse environmental impacts to the extent necessary to protect public health, safety, and welfare, but only after taking into consideration cost-effectiveness and technical feasibility. Finally, in declining to

engage in rulemaking, the Commission reasonably relied on the facts that it was already working with the CDPHE to address the concerns underlying Respondents' proposed rule and that other Commission priorities took precedence at this time.

**2019 CO 3**

---

**Supreme Court Case No. 17SC297**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 16CA564

---

**Petitioners:**

Colorado Oil and Gas Conservation Commission, American Petroleum Institute, and Colorado Petroleum Association,

v.

**Respondents:**

Xiuhtezcatl Martinez, Itzcuahtli Roske-Martinez, Sonora Brinkley, Aerielle Deering, Trinity Carter, Jamirah DuHamel, and Emma Bray, minors appearing by and through their legal guardians Tamara Roske, Bindi Brinkley, Eleni Deering, Jasmine Jones, Robin Ruston, and Diana Bray.

---

**Judgment Reversed**
*en banc*
January 14, 2019

---

**Attorneys for Petitioner Colorado Oil and Gas Conservation Commission:**
Philip J. Weiser, Attorney General
John E. Matter, Jr., Senior Assistant Attorney General
Marian C. Larsen, Assistant Attorney General
Kyle W. Davenport, Assistant Attorney General
 *Denver, Colorado*

**Attorneys for Petitioners American Petroleum Institute and Colorado Petroleum Association:**
Hogan Lovells US LLP
Jennifer L. Biever
Jessica Black Livingston
Dale Ratliff
 *Denver, Colorado*

Hogan Lovells US LLP
Catherine E. Stetson
*Washington, District of Columbia*

Ryley Carlock & Applewhite
Richard C. Kaufman
Julie A. Rosen
Matthew K. Tieslau
*Denver, Colorado*

**Attorneys for Respondents:**
Katherine Merlin
*Boulder, Colorado*

Wild Earth Advocates
Julia Olson
*Eugene, Oregon*

MindDrive Legal Services, LLC
James Daniel Leftwich
*Boulder, Colorado*

**Attorneys for Amici Curiae Alliance of Nurses for Healthy Environments &
Physicians for Social Responsibility:**
Earthjustice
Joel Minor
Michael S. Freeman
*Denver, Colorado*

**Attorneys for Amicus Curiae The Board of County Commissioners of Adams County,
Colorado:**
Heidi Miller, Adams County Attorney
*Brighton, Colorado*

Goldman, Robbins, Nicholson & Mack, P.C.
Jeffery P. Robbins
*Durango, Colorado*

**Attorneys for Amicus Curiae The Chamber of Commerce of the United States of
America:**
Kittredge LLC
Daniel D. Domenico
Michael Francisco
*Denver, Colorado*

**Attorneys for Amicus Curiae The Colorado Alliance Mineral and Royalty Owners:**
Visani Bargell LLC
Cynthia L. Bargell
*Dillon, Colorado*

**Attorneys for Amici Curiae Colorado Farm Bureau, Denver Metro Chamber of Commerce, Associated Governments of Northwest Colorado, and Town of Rangely, Colorado:**
Brownstein Hyatt Farber Schreck, LLP
Julia E. Rhine
*Denver, Colorado*

**Attorneys for Amicus Curiae Colorado League of Women Voters:**
Law Offices of Angelique Layton Anderson
Angelique Layton Anderson
*Louisville, Colorado*

**Attorneys for Amicus Curiae Colorado Oil & Gas Association:**
Brownstein Hyatt Farber Schreck, LLP
Mark J. Mathews
*Denver, Colorado*

**Attorneys for Amici Curiae Colorado PTA, Together Against Neighborhood Drilling, Dr. Stephanie Malin, Stacia Ryder, Shirley Smithson, and Ulrike Webster:**
Berg Hill Greenleaf Ruscitti LLP
Rudy E. Verner
Megan Gutwein
*Boulder, Colorado*

**Attorneys for Amicus Curiae League of Oil and Gas Impacted Coloradans:**
Chiropolos Law
Mike Chiropolos
*Boulder, Colorado*

**Attorneys for Amici Curiae Local Governments:**
Boulder County
David Hughes, Deputy County Attorney
Katherine A. Burke, Senior Assistant County Attorney
*Boulder, Colorado*

City of Boulder
Thomas A. Carr, City Attorney
*Boulder, Colorado*

City and County of Broomfield
Patricia W. Gilbert, City and County Attorney
*Broomfield, Colorado*

City of Commerce City
Robert D. Sheesley, City Attorney
*Commerce City, Colorado*

Eagle County
Bryan Treu, Eagle County Attorney
*Eagle, Colorado*

Town of Erie
Hoffmann, Parker, Wilson, & Carberry, P.C.
Kendra L. Carberry
Evin B. King
*Denver, Colorado*

City of Fort Collins
Carrie Mineart Daggett, City Attorney
*Fort Collins, Colorado*

Gunnison County
David Baumgarten, Gunnison County Attorney
Matthew Hoyt, Assistant County Attorney
*Gunnison, Colorado*

City of Lafayette
Williamson & Hayashi, LLC
David S. Williamson
*Boulder, Colorado*

City of Longmont
Daniel Kramer, Assistant City Attorney
*Longmont, Colorado*

City of Louisville
Light Kelly P.C.
Samuel J. Light
*Denver, Colorado*

Pitkin County
John Ely, Pitkin County Attorney
*Aspen, Colorado*

San Miguel County
Amy T. Markwell, San Miguel County Attorney
*Telluride, Colorado*

Summit County
Jeffrey L. Huntley, Summit County Attorney
*Breckenridge, Colorado*

City of Westminster
David Frankel, City Attorney
*Westminster, Colorado*

**Attorney for Amicus Curiae Mountain States Legal Foundation:**
Cody J. Wisniewski
*Lakewood, Colorado*

**Attorneys for Amici Curiae The National Association of Manufacturers, the National Federation of Independent Business Small Business Legal Center, the Colorado Association of Commerce & Industry, and the Independent Petroleum Association of America:**
Lewis Bess Williams and Weese P.C.
Ezekiel J. Williams
Carlos R. Romo
*Denver, Colorado*

**Attorney for Amicus Curiae Northwest Colorado Council of Governments**
Torie Jarvis
*Silverthorne, Colorado*

**Attorneys for Amici Curiae Our Health, Our Future, Our Longmont; Sierra Club; Earthworks; Food & Water Watch; Conservation Colorado; Weld Air & Water; and Wall of Women:**
Environmental Law Clinic, University of Denver Sturm College of Law
Timothy Estep
Kevin Lynch
*Denver, Colorado*

**Attorneys for Amici Curiae 350 Colorado; Be the Change; Broomfield Clean Air and Water; Broomfield Moms Active Community; Center for Biological Diversity; Citizens for a Healthy Community; Citizens for Huerfano County; Clean Energy Action; Colorado Rising; Earth Guardians; Eco-Justice Ministries; Erie Protectors; Front Range Residents for Environment, Safety and Health; Loretto Earth Network; North Range Concerned Citizens; Northern Colorado Community Rights Network; Our Health, Our Future, Our Longmont; Protect Our Loveland; Transition Fort Collins; and Wall of Women Colorado:**
Western Environmental Law Center
Kyle Tisdel
    *Taos, New Mexico*

**Attorneys for Amicus Curiae Vital for Colorado:**
Holland & Hart LLP
Stephen G. Masciocchi
    *Denver, Colorado*

Robinson, Waters & O'Dorisio PC
Peter T. Moore
Kimberly Bruetsch
    *Denver Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.

6

¶1 Respondents Xiuhtezcatl Martinez, Itzcuahtli Roske-Martinez, Sonora Brinkley, Aerielle Deering, Trinity Carter, Jamirah DuHamel, and Emma Bray are youth activists who have devoted substantial time and effort toward pursuing their goal of protecting the health of Colorado citizens and Colorado's environment. The court acknowledges the civic engagement of these young men and women as well as the concerns that motivated this action, and nothing in this opinion should be construed as expressing a view as to the merits of Respondents' concerns, or, conversely, as to the merits of the Colorado Oil and Gas Conservation Commission's (the "Commission's") interest in fostering the responsible, balanced development, production, and utilization of Colorado's oil and gas resources. The resolution of these weighty and sometimes conflicting policy concerns, however, is not the issue before us. Rather, this case requires us to decide whether, in accordance with the Colorado Oil and Gas Conservation Act (the "Act"), section 34-60-102(1)(a)(I), C.R.S. (2018), the Commission properly declined to engage in rulemaking to consider a rule proposed by Respondents, which we view as a far narrower question.

¶2 Respondents proposed a rule that, among other things, would have precluded the Commission from issuing any permits for the drilling of an oil and gas well "unless the best available science demonstrates, and an independent, third-party organization confirms, that drilling can occur in a manner that does not cumulatively, with other actions, impair Colorado's atmosphere, water, wildlife, and land resources, does not adversely impact human health, and does not contribute to climate change."

7

¶3     After soliciting and receiving public comment and allowing interested parties to be heard, the Commission declined to engage in rulemaking to consider this proposed rule because, among other things, (1) the rule would have required the Commission to readjust the balance purportedly crafted by the General Assembly under the Act and conditioned new oil and gas drilling on a finding of no cumulative adverse impacts, both of which the Commission believed to be beyond its statutory authority, and (2) the Commission was already working with the Colorado Department of Public Health and Environment ("CDPHE") to address the concerns to which the rule was directed and other Commission priorities took precedence over the proposed rulemaking at this time.

¶4     Respondents challenged the Commission's ruling in the Denver District Court, but that court ultimately upheld the Commission's decision.  Respondents appealed, and, in a split, published decision, a division of the court of appeals reversed the district court's order. *Martinez v. Colo. Oil & Gas Conservation Comm'n*, 2017 COA 37, __ P.3d __.  We then granted certiorari.[1]

¶5     We now conclude, contrary to the division majority below, that the Commission properly declined to engage in rulemaking to consider Respondents' proposed rule.  We

---

[1] We granted certiorari to review the following issue:

> Whether the Court of Appeals erred in determining that the Colorado Oil and Gas Conservation Commission misinterpreted section 34-60-102(1)(a)(I) as requiring a balance between oil and gas development and public health, safety, and welfare.

reach this conclusion for three primary reasons. First, our review of an administrative agency's decision as to whether to engage in rulemaking is limited and highly deferential. Second, in our view, the Commission correctly determined that, under the applicable language of the Act, it could not properly adopt the rule proposed by Respondents. Specifically, as the Commission recognized, the pertinent provisions do not allow it to condition all new oil and gas development on a finding of no cumulative adverse impacts to public health and the environment. Rather, the provisions make clear that the Commission is required (1) to foster the development of oil and gas resources, protecting and enforcing the rights of owners and producers, and (2) in doing so, to prevent and mitigate significant adverse environmental impacts to the extent necessary to protect public health, safety, and welfare, but only after taking into consideration cost-effectiveness and technical feasibility. Finally, in declining to engage in rulemaking, the Commission reasonably relied on the facts that it was already working with the CDPHE to address the concerns underlying Respondents' proposed rule and that other Commission priorities took precedence at this time.

¶6 Accordingly, we reverse the judgment of the division below.

## I. Facts and Procedural History

¶7 In 2013, Respondents petitioned the Commission to promulgate a rule providing, as pertinent here, that

> [t]he Commission shall not issue any permits for the drilling of a well for oil and gas unless the best available science demonstrates, and an independent, third-party organization confirms, that drilling can occur in a manner that does not cumulatively, with other actions, impair Colorado's

9

atmosphere, water, wildlife, and land resources, does not adversely impact human health, and does not contribute to climate change.

¶8 In support of their petition, Respondents asserted, among other things, that "hydraulic fracturing is adversely impacting human health," as well as impairing "Colorado's atmosphere, water, soil, and wildlife resources," and that "[t]he science unequivocally shows that anthropogenic climate change is occurring and is threatening the stability of the global climate." The petition further claimed that "[t]he Public Trust Doctrine demands that Colorado act to preserve the atmosphere and provide a livable future for present and future generations of Colorado residents."

¶9 After receiving the Petition, the Commission solicited written comments from interested persons and parties, held a public hearing at which numerous parties testified for and against the proposed rule, and then engaged in deliberations based on the over 1,100-page administrative record that had been created as a result of this process. Ultimately, by unanimous vote, the Commissioners issued a written order declining to engage in rulemaking to consider adopting Respondents' proposed rule. In so ruling, the Commission found and concluded, as pertinent here, that (1) "[t]he Proposed Rule, if adopted, would have required the Commission to readjust the balance crafted by the General Assembly under the Act, and is therefore beyond the Commission's limited grant of statutory authority"; (2) "the Proposed Rule hinges on conditioning new oil and gas drilling on a finding of no cumulative adverse impacts, which is beyond the Commission's limited statutory authority"; (3) Colorado courts have expressly rejected the public trust doctrine; (4) "[t]he Commission, in cooperation with the [CDPHE] is

10

currently addressing many of the concerns in the Petition"; (5) "[m]ost, if not all, of the relief sought in the Petition related to air quality is within CDPHE's jurisdiction, and not [the Commission's] jurisdiction"; and (6) "[t]here are other Commission priorities that must take precedence over the proposed rulemaking at this time."

¶10 Respondents challenged the Commission's order in the Denver District Court, after which the American Petroleum Institute and the Colorado Petroleum Association intervened as defendants. As pertinent here, Respondents argued in the district court that the Commission's order was arbitrary and capricious, an abuse of discretion, and otherwise contrary to law. In doing so, Respondents principally relied on the first subsection of the Act's legislative declaration, which states that it is in the public interest to

> [f]oster the responsible, balanced development, production, and utilization of the natural resources of oil and gas in the state of Colorado *in a manner consistent with* protection of public health, safety, and welfare, including protection of the environment and wildlife resources.

§ 34-60-102(1)(a)(I) (emphasis added). According to Respondents, "in a manner consistent with" indicates that the General Assembly "set out a mandatory condition that must be satisfied," rather than a balancing test, as Respondents read the Commission's order to require.

¶11 The district court ultimately disagreed and, applying the two-part test articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), concluded that the pertinent statutory language is clear and requires the

11

Commission to "strike a balance between the regulation of oil and gas operations and protecting public health, the environment, and wildlife resources."

¶12    Respondents then appealed the district court's order, and, in a split, published decision, a division of the court of appeals agreed that the Act's plain language is clear and unambiguous but concluded that this language "supports a conclusion different from that reached by the Commission and the district court." *Martinez*, ¶ 19. Specifically, in the majority's view, "in a manner consistent with" protection of public health, safety, and welfare did not indicate a balancing test weighing public health, safety, and welfare against oil and gas production. *Id.* at ¶¶ 17, 21.  Rather, "in a manner consistent with" indicated "a condition that must be fulfilled." *Id.* at ¶ 21.

¶13    In support of this conclusion, the majority opined that the term "balanced" in section 34-60-102(1)(a)(I) relates to and modifies "development, production, and utilization" but does not affect the remaining provisions in that section, including the language relating to public health, safety, and welfare. *Id.* at ¶ 20.  The majority further observed that numerous Colorado cases use the phrase "in a manner consistent with" to mean "subject to," rather than "balanced with." *Id.* at ¶¶ 22–24.  And the majority stated that the Act's legislative history reveals the legislature's "general movement away from unfettered oil and gas production and [its] incorporation of public health, safety, and welfare as a check on that development." *Id.* at ¶ 30.

¶14    Judge Booras dissented.  She began by noting that the language, "in a manner consistent with," appears in the Act's legislative declaration and that this language therefore could be used only to interpret an ambiguous statute; it could not override the

12

Act's operative language. *Id.* at ¶ 41 (Booras, J., dissenting). She then explained that the "actual authority" of the Commission to regulate oil and gas is set out in section 34-60-106(2)(d), C.R.S. (2018), which provides that the Commission is authorized to regulate oil and gas operations

> so as to prevent and mitigate significant adverse environmental impacts on any air, water, soil, or biological resource resulting from oil and gas operations to the extent necessary to protect public health, safety, and welfare, including protection of the environment and wildlife resources, taking into consideration cost-effectiveness and technical feasibility.

*Id.* at ¶ 42. In Judge Booras's view, the fact that the Act instructs the Commission to consider cost-effectiveness and technical feasibility suggests that the protection of public health, safety, and welfare is not, by itself, a determinative consideration. *Id.* at ¶ 43.

¶15 The Commission and Intervenors independently petitioned this court to review the division's decision. Respondents opposed the petitions, the Commission and Intervenors filed reply briefs, and numerous parties filed amicus briefs. We granted review.

## II. Analysis

¶16 We begin by setting forth the applicable standard of review and principles of statutory construction. We then discuss the pertinent provisions of the Act, and, perceiving those provisions to be ambiguous, we proceed to construe them. We end by considering, in light of our statutory construction, whether the Commission properly declined to engage in rulemaking to consider Respondents' proposed rule, and we conclude that it did.

13

## A. Standard of Review and Principles of Statutory Construction

¶17 We review an agency's refusal to engage in rulemaking under Colorado's Administrative Procedure Act, section 24-4-106(7)(b), C.R.S. (2018). This statute requires us to hold unlawful and set aside agency actions found to be, among other things, arbitrary or capricious; in excess of statutory jurisdiction, authority, purposes, or limitations; an abuse of discretion; unsupported by substantial evidence when the record is considered as a whole; or otherwise contrary to law. *Id.*

¶18 An agency has broad discretion to decide whether to engage in rulemaking, and, thus, our review of its decision as to whether to do so is "'extremely limited' and 'highly deferential.'" *Massachusetts v. EPA*, 549 U.S. 497, 527–28 (2007) (quoting *Nat'l Customs Brokers & Forwarders Ass'n. of Am., Inc. v. United States*, 883 F.2d 93, 96 (D.C. Cir. 1989)); *see also Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 599 F.3d 662, 667 (D.C. Cir. 2010) ("'[A]n agency's refusal to institute rulemaking proceedings is at the high end of the range' of levels of deference we give to agency action under our 'arbitrary and capricious' review.") (quoting *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008)); *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 103 (D.D.C. 2010) (explaining that an agency's refusal to promulgate a rule "is to be overturned only in the rarest and most compelling of circumstances . . . which have primarily involved plain errors of law, suggesting that the agency has been blind to the source of its delegated power") (quoting *Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 5 (D.C. Cir. 1987)). One of the main purposes of limitations such as these is "to avoid judicial entanglement in abstract policy

14

disagreements which courts lack both expertise and information to resolve." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004).

¶19    We review issues of statutory interpretation de novo. *UMB Bank, N.A. v. Landmark Towers Ass'n*, 2017 CO 107, ¶ 22, 408 P.3d 836, 840. In doing so, we look to the entire statutory scheme in order to give consistent, harmonious, and sensible effect to all of its parts, and we apply words and phrases in accordance with their plain and ordinary meanings. *Id.* When the statutory language is clear, we apply it as written and need not resort to other rules of statutory construction. *Id.* When, however, the statutory language is ambiguous, we may examine the legislative intent, the circumstances surrounding the statute's adoption, and the possible consequences of different interpretations to determine the proper construction of the statute. *Coffman v. Williamson*, 2015 CO 35, ¶ 23, 348 P.3d 929, 936. A statute is ambiguous when it is reasonably susceptible of multiple interpretations. *Id.*

## B. Applicable Provisions of the Act

¶20    Section 34-60-102(1) sets forth the Act's legislative declaration and provides, in pertinent part:

(1)(a) It is declared to be in the public interest to:

(I) Foster the responsible, balanced development, production, and utilization of the natural resources of oil and gas in the state of Colorado in a manner consistent with protection of public health, safety, and welfare, including protection of the environment and wildlife resources;

(II) Protect the public and private interests against waste in the production and utilization of oil and gas;

15

(III) Safeguard, protect, and enforce the coequal and correlative rights of owners and producers in a common source or pool of oil and gas . . . ;

(IV) Plan and manage oil and gas operations in a manner that balances development with wildlife conservation . . . ;

(b) . . . It is the intent and purpose of this article to permit each oil and gas pool in Colorado to produce up to its maximum efficient rate of production, subject to the prevention of waste, consistent with the protection of public health, safety, and welfare, including protection of the environment and wildlife resources, and subject further to the enforcement and protection of the coequal and correlative rights of the owners and producers of a common source of oil and gas . . . .

¶21  Section 34-60-105(1), C.R.S. (2018), provides the Commission with "the power to make and enforce rules, regulations, and orders pursuant to this article, and to do whatever may reasonably be necessary to carry out the provisions of this article."

¶22  Section 34-60-106(2)(d), in turn, sets forth additional powers of the Commission, including, as pertinent here, the power to regulate

[o]il and gas operations so as to prevent and mitigate significant adverse environmental impacts on any air, water, soil, or biological resource resulting from oil and gas operations to the extent necessary to protect public health, safety, and welfare, including protection of the environment and wildlife resources, taking into consideration cost-effectiveness and technical feasibility.

¶23  Petitioners assert that the foregoing statutory language makes clear that the Commission must balance oil and gas development with the protection of public health and the environment. They emphasize that the words "in a manner consistent with" in the legislative declaration cannot override the Act's substantive provisions, which, petitioners say, unambiguously require a balanced regulatory approach and command the Commission to pursue a number of different policy goals, including both the

16

production, development, and utilization of oil and gas resources and the protection of public health and the environment.

¶24 Petitioners further contend that even if it were proper to focus exclusively on the legislative declaration, "consistent with" cannot mean the same as "subject to" because it would effectively re-write section 34-60-102(1)(b), which uses both phrases in the same sentence:

> (b) . . . It is the intent and purpose of this article to permit each oil and gas pool in Colorado to produce up to its maximum efficient rate of production, *subject to* the prevention of waste, *consistent with* the protection of public health, safety, and welfare, including protection of the environment and wildlife resources, and *subject further to* the enforcement and protection of the coequal and correlative rights of the owners and producers of a common source of oil and gas . . . .

(Emphases added.)

¶25 And Petitioners contend that the construction adopted by the division majority below arguably ignores other provisions of the Act, as well as the Act's legislative history, which Petitioners assert shows that the Act aims, at least in part, to foster oil and gas development in this state.

¶26 Respondents reply that the division correctly concluded that the phrase "in a manner consistent with public health, safety, and welfare" in section 34-60-102(1)(a)(I) does not indicate a balancing test but rather establishes a condition that must be fulfilled. *See Martinez*, ¶ 21. In support of this argument, Respondents first point out that the words "responsible, balanced" relate to and modify the immediately following nouns, namely, "development, production, and utilization," but not any subsequent words in the section. Thus, "responsible" and "balanced" do not indicate a balancing of oil and

17

gas development against public health. Rather, those words refer to the development, production, and utilization of oil and gas in a manner that does not waste those resources and that protects correlative rights.

¶27    Respondents further assert that, contrary to Petitioners' contentions, the legislative declaration provides the Commission "an uncontroverted mandate to regulate oil and gas development and operations in a certain manner" and "[t]he substantive provisions of the Act give the Commission the statutory authority to effectuate that mandate."

¶28    Finally, Respondents assert that (1) other portions of the Act support a construction that mandates protection of public health, safety, and welfare; (2) interpreting "consistent with" to mean "subject to" does not re-write portions of the Act because both phrases merely indicate conditions that must be fulfilled; and (3) the division majority's interpretation of the Act is consistent with other cases interpreting the Act.

¶29    In our view, the above-quoted statutory language is reasonably susceptible of the interpretations proffered by both Petitioners and Respondents in this case, a conclusion that we believe to be supported by the fact that the district court and Judge Booras agreed with Petitioners' interpretation while the division majority below agreed with Respondents' interpretation (notwithstanding the fact that all of those jurists believed that their respective interpretations were supported by the Act's unambiguous language).

¶30    Because we believe that the applicable statutory language is reasonably susceptible of multiple interpretations, we conclude that that language is ambiguous. *See*

18

*Coffman*, ¶ 23, 348 P.3d at 936. We thus turn to other tools of statutory construction, including the Act's statutory and legislative history, to aid us in interpreting the Act's pertinent provisions. *See id.*[2]

## C. History of the Act and Statutory Construction

¶31 The statutory history of the Act informs our understanding of legislative intent here. The General Assembly first passed the Act in 1951 to "defin[e] and prohibit[] the waste of oil and gas in the state of Colorado" and to establish and set forth the authority of the Commission. Ch. 230, 1951 Colo. Sess. Laws 651, 651.

¶32 In 1955, the General Assembly added a declaration of purpose, and, for the next three decades, the Act's primary policy goal was to "foster, encourage and promote the development, production and utilization of the natural resources of oil and gas in the state of Colorado." Ch. 208, sec. 10, § 100-6-22, 1955 Colo. Sess. Laws 648, 657.

¶33 In 1985, the General Assembly amended the Act and for the first time expressly addressed concerns regarding public health, safety, and welfare. Ch. 272, sec. 1,

---

[2] For purposes here, we use "statutory history" to refer to the evolution of a statute as it is amended over time by the legislature and "legislative history" to refer to the development of a statute during the legislative process and prior to enactment or amendment. "Legislative history" thus encompasses, for example, bill drafts and bill sponsor comments. By examining the statutory history of the Act as we proceed to do below, we do not mean to suggest that we necessarily must deem a statute ambiguous before considering its statutory history. *See, e.g.*, *Denver Publ'g Co. v. Bd. of Cty. Comm'rs*, 121 P.3d 190, 197–98 (Colo. 2005) (examining the statutory history of the Colorado Open Records Act without declaring it to be ambiguous); *see also Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 231 (2007) (relying on the statutory history of 28 U.S.C. § 1447 to assist in its interpretation without declaring that provision to be ambiguous).

19

§ 34-60-106(10)–(11), 1985 Colo. Sess. Laws 1129, 1129. Specifically, at that time, the legislature authorized the Commission to promulgate rules and regulations to protect the health, safety, and welfare of any person at an oil and gas well and of the general public in the drilling, completion, and operation of oil and gas wells and production facilities. *Id.* The legislature did not, however, alter any of its previously established legislative purposes.

¶34 The legislature again noted the importance of public health, safety, and welfare when it amended the Act in 1994, to add that it is in the public interest to foster, encourage, and promote the development, production, and utilization of the natural resources of oil and gas in Colorado "in a manner consistent with protection of public health, safety, and welfare." Ch. 317, sec. 2, § 34-60-102(1), 1994 Colo. Sess. Laws 1978, 1978.

¶35 And the legislature expressed its concern for public health, safety, and welfare when it amended the Act in 2007, to include "protection of the environment and wildlife resources" as a component of public health, safety, and welfare. Ch. 320, sec. 2, § 34-60-102(1), 2007 Colo. Sess. Laws 1357, 1357. Notably, in 2007, the legislature also amended subsection 34-60-102(1)(a)(I)'s language to note that it is in the public interest to "foster the *responsible, balanced* development" of oil and gas. Ch. 320, sec. 2, § 34-60-102(1), 2007 Colo. Sess. Laws 1357, 1357 (emphasis added).

¶36 Unlike the division majority below, we do not read this lengthy statutory history as reflecting a legislative intention to establish the protection of public health, safety, and welfare as a check on oil and gas development. Nor do we perceive in this history an

20

intention to condition further oil and gas development on a finding of no cumulative adverse impacts to public health or the environment. Rather, we view this history as reflecting a legislative intent to promote multiple policy objectives, including the continued development of oil and gas resources and the protection of public health and the environment, without conditioning one policy objective on the satisfaction of any other.

¶37 Our view in this regard finds substantial support in the legislative history of the Act, and particularly in the testimony of the representatives who sponsored and introduced the legislative bills that added health, safety, and welfare concerns to the Act's legislative declaration. *See Vensor v. People*, 151 P.3d 1274, 1279 (Colo. 2007) ("While by no means conclusive, the testimony of a bill's sponsor concerning its purpose and anticipated effect can be powerful evidence of legislative intent.").

¶38 For example, in introducing to the Agriculture, Natural Resources, and Energy Committee the bill that added the language "in a manner consistent with" to the Act's legislative declaration, Representative Jerke explained that the added language

> gets us a long way in the direction that I think that we need to go in making sure that the oil industry can still operate in an economical manner. We're not putting them out of business through this. We're taking far, far better care of our land, our water, even our air as a result of this legislation.

Hearings on S.B. 94-177 before the Agric., Nat. Res., and Energy Comm., 64th Gen. Assemb., 2d Sess. (Mar. 24, 1994) (statement of Rep. Jerke).

¶39 Similarly, when Representative Jerke introduced the Bill to the House, he explained that the Commission "will indeed have the ability to foster, encourage, and

promote the development and production and utilization of oil and gas . . . . [W]e're giving them the ability not just to advance the industry, as they've done in the past, but to also deal with public health, safety, welfare, those kinds of issues." Hearings on S.B. 94-177 before the House, 64th Gen. Assemb., 2d Sess. (Apr. 26, 1994) (statement of Rep. Jerke).

¶40 And when Representative Curry introduced the House Bill that added "protection of the environment and wildlife resources" to section 34-60-102(1)(a)(I), she explained:

> Energy development can occur in a manner that minimizes adverse impact to the public health and environment. In fact, it is. Certain operators are taking aggressive steps to make sure that we are protecting those other values. It does not have to be a zero-sum game with the winner taking all. We need a regulatory framework, however, that will provide a mechanism for considering these other impacts, both positive and negative.

Hearings on H.B. 07-1341 before the H. Agric. Comm., 66th Gen. Assemb., 1st Sess. (Mar. 14, 2007) (statement of Rep. Curry).

¶41 Reading the above-quoted portions of the Act in light of this legislative history and in the context of the Act as a whole leads us to conclude that these provisions do not allow the Commission to condition all new oil and gas development on a finding of no cumulative adverse impacts to public health and the environment, as Respondents assert the Commission must do. Nor do we perceive the statutory language as creating a balancing test by which the public's interest in oil and gas development is weighed against its interest in public health and the environment, as Petitioners seem to suggest. Rather, in our view, the pertinent provisions make clear that the Commission is required (1) to foster the development of oil and gas resources, protecting and enforcing the rights

22

of owners and producers, and (2) in doing so, to prevent and mitigate significant adverse environmental impacts to the extent necessary to protect public health, safety, and welfare, but only after taking into consideration cost-effectiveness and technical feasibility. We reach this conclusion for several reasons.

¶42 First, sections 34-60-105(1) and 34-60-106(2)(d) provide the Commission with authority to regulate public health, safety, welfare, and environmental concerns as an important component of its role in overseeing oil and gas development. Hence, section 34-60-106(2)(d) authorizes the Commission to regulate oil and gas operations so as to avoid "*and mitigate significant*" adverse environmental impacts to the extent necessary to protect public health, safety, and welfare, "*taking into consideration cost-effectiveness and technical feasibility.*" *Id.* (emphases added). In our view, this statutory language envisions some possible environmental and public health risks. Had the legislature intended to preclude *any* cumulative adverse impacts, as Respondents claim, the statute would not have included the language "and mitigate significant" or "taking into consideration cost-effectiveness and technical feasibility." Rather, the provision would have required the Commission to regulate oil and gas operations so as to avoid adverse environmental impacts on any air, water, soil, or biological resource, to the extent necessary to protect public health, safety, and welfare, including protection of the environment and wildlife resources.

¶43 Second, the Act's legislative declaration, when read as a whole, evinces the General Assembly's intent that the Commission pursue multiple policy goals and not condition one legislative objective on the satisfaction of another. As explained above, the

23

declaration begins by stating that it is in the public interest to "[f]oster the responsible, balanced development, production, and utilization of the natural resources of oil and gas in the state of Colorado in a manner consistent with protection of public health, safety, and welfare, including protection of the environment and wildlife resources." § 34-60-102(1)(a)(I). But this is not the only policy goal set forth in that section. The declaration also directs the Commission to (1) "[p]rotect the public and private interests against waste in the production and utilization of oil and gas"; (2) "[s]afeguard, protect, and enforce the coequal and correlative rights of owners and producers in a common source or pool of oil and gas"; (3) "[p]lan and manage oil and gas operations in a manner that balances development with wildlife conservation"; and (4) "permit each oil and gas pool in Colorado to produce up to its maximum efficient rate of production, subject to the prevention of waste, consistent with the protection of public health, safety, and welfare." § 34-60-102(1).

¶44 Third, the above-described legislative history, and particularly the testimony of the legislators who sponsored the bills adding the words "in a manner consistent with" and "protection of the environment and wildlife resources" to the legislative declaration, makes clear that, in adding this language, the legislature's intent was not to create a condition precedent to further oil and gas development. Rather, its intent was to minimize adverse impacts to public health and the environment while at the same time

24

ensuring that oil and gas development, production, and utilization could proceed in an economical manner.[3]

## D. The Current Rulemaking Petition

¶45  Against this background, we turn to the ultimate question before us, namely, whether the Commission properly declined to engage in rulemaking to consider the rule proposed by Respondents.

¶46  As noted above, the Commission declined to engage in rulemaking because, among other things, (1) it believed that adopting the rule proposed by Respondents would be beyond the Commission's statutory authority and (2) it was already working with the CDPHE to address the concerns to which the proposed rule was directed and other Commission priorities took precedence at this time. In our view, the Commission's decision was well within its discretion.

¶47  With respect to the Commission's understanding of its authority, we note, as an initial matter, that the briefing in this case sometimes conflates the terms "authority" and "jurisdiction." We, however, do not read the Commission's order as concluding that it lacked subject matter jurisdiction to consider Respondents' proposed rule. Rather, we

---

[3] In reaching this conclusion, we hasten to add that we do not intend to decide here the full range or limits of the Commission's statutory authority. Rather, we decide only the issues that the parties have presented to us, namely, (1) the proper construction of the Act's legislative declaration and (2) whether, in light of that construction and the deference due to an administrative agency's decision as to whether to engage in rulemaking, the Commission properly declined to engage in rulemaking to consider the proposed rule at issue in this case.

25

understand the Commission's focus to have been on whether, consistent with its statutory mandate, it could adopt the rule proposed by Respondents.

¶48 With that understanding, we cannot say that the Commission's decision to decline to engage in rulemaking to consider Respondents' proposed rule was arbitrary or capricious; in excess of statutory jurisdiction, authority, purposes, or limitations; an abuse of discretion; unsupported by substantial evidence when the record is considered as a whole; or otherwise contrary to law. *See* § 24-4-106(7)(b).

¶49 As previously noted, Respondents' proposed rule would have precluded new oil and gas development unless it could occur "in a manner that does not cumulatively, with other actions, impair Colorado's atmosphere, water, wildlife, and land resources, does not adversely impact human health, and does not contribute to climate change."

¶50 In light of our above-described construction of the pertinent provisions of the Act, we conclude that the Commission correctly determined that it could not, consistent with those provisions, adopt such a rule. Specifically, as set forth above, we do not believe that the pertinent provisions of the Act allow the Commission to condition one legislative priority (here, oil and gas development) on another (here, the protection of public health and the environment). Accordingly, in our view, the Commission properly exercised its discretion in declining to engage in rulemaking to consider Respondents' proposed rule.

¶51 But this was not the sole basis for the Commission's decision. Equally significant, the Commission declined to engage in rulemaking because it was already working with the CDPHE to address many of the concerns implicated by Respondents' petition and

other regulatory priorities took precedence at this time. In our view, the Commission again acted within its discretion in making such a decision.

¶52 Here, the Commission's finding that the issues implicated by Respondents' petition are being addressed elsewhere is amply supported by the record, and this is precisely the kind of agency action to which courts owe deference. *See Massachusetts*, 549 U.S. at 527 (noting that "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities"); *see also Compassion Over Killing v. FDA*, 849 F.3d 849, 857 (9th Cir. 2017) ("[T]he agency's decision to prioritize other projects is entitled to great deference by a reviewing court."); *Simpson v. Cotton Creek Circles, LLC*, 181 P.3d 252, 261 (Colo. 2008) (noting that "courts defer to policy determinations in rule-making proceedings"). This is particularly true in this case, where the Commission specifically indicated that it was collaborating with the CDPHE to address the matters implicated by Respondents' proposed rule and where the Commission noted, with record support, that other priorities took precedence over the proposed rulemaking.

¶53 Because the Commission's decision to decline to conduct a rulemaking proceeding to consider Respondent's proposed rule was based on a correct understanding of the Commission's statutory charge and on an amply supported finding as to the proper use of the Commission's resources, we perceive no abuse of discretion in the Commission's decision to decline to engage in rulemaking to consider the specific rule at issue here.

## III. Conclusion

¶54     Because the Commission's decision to decline to engage in rulemaking to consider Respondents' proposed rule was consistent with the applicable provisions of the Act and with the Commission's authority to decide how best to marshal its resources to carry out its statutory duties, we perceive no abuse of discretion in that decision.  Accordingly, we reverse the judgment of the division below.