The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
July 1, 2021

## 2021COA87

**No. 19CA2076, *Accetta v. Brooks Towers Residences* — Common Interest Communities — Colorado Common Interest Ownership Act — Procedure to Elect Treatment**

In this case, a division of the court of appeals considers whether section 38-33.3-118, C.R.S. 2020, provides the exclusive means for a common interest community association that existed prior to the effective date of the Colorado Common Interest Ownership Act (CCIOA) to elect to be governed by the entirety of CCIOA. Concluding that it does, the division rejects the argument that such an election can be made simply by recording a new declaration that might be interpreted to adopt the provisions of CCIOA.

The division therefore affirms the trial court's grant of summary judgment in favor of defendants, an association and its

individual board members, on a declaratory judgment claim brought by two residents under CCIOA. The division also affirms the trial court's grant of summary judgment in favor of defendants on the residents' common law claims. Finally, the division concludes that defendants are entitled to recover their appellate attorney fees under section 38-33.3-123(1)(c), C.R.S. 2020, and remands the case to the trial court to determine the amount of such fees and award them to defendants.

Court of Appeals No. 19CA2076
City and County of Denver District Court No. 17CV34787
Honorable Morris B. Hoffman, Judge

Anthony T. Accetta and Nancy Accetta,

Plaintiffs-Appellants,

v.

Brooks Towers Residences Condominium Association, Inc., a Colorado
nonprofit corporation; Mark Trenka, in his capacity as a member of the Board
of Directors of the Brooks Towers Residences Condominium Association, Inc.;
Marla Grant, in her capacity as a member of the Board of Directors of the
Brooks Towers Residences Condominium Association, Inc.; Bill Clarke, in his
capacity as a member of the Board of Directors of the Brooks Towers
Residences Condominium Association, Inc.; Clay Courter, in his capacity as a
member of the Board of Directors of the Brooks Towers Residences
Condominium Association, Inc.; Robb Green, in his capacity as a member of
the Board of Directors of the Brooks Towers Residences Condominium
Association, Inc.; and Joan Foster, in her capacity as a member of the Board of
Directors of the Brooks Towers Residences Condominium Association, Inc.,

Defendants-Appellees.

---

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE GOMEZ
Furman and Tow, JJ., concur

Announced July 1, 2021

---

Foley & Mansfield, PLLP, Dustin J. Priebe, Englewood, Colorado; Podoll &
Podoll, P.C., Robert C. Podoll, Greenwood Village, Colorado for Plaintiffs-
Appellants

Nemirow Perez P.C., Ronald H. Nemirow, Miles Buckingham, Lakewood, Colorado, for Defendants-Appellees

¶ 1     In this case, we are asked to resolve an issue of first impression under the Colorado Common Interest Ownership Act (CCIOA), sections 38-33.3-101 to -401, C.R.S. 2020, which governs the creation and operation of common interest communities in the state.

¶ 2     Specifically, we consider whether section 38-33.3-118, C.R.S. 2020, provides the exclusive means for a common interest community association that existed prior to the effective date of CCIOA to elect to be governed by the entirety of CCIOA.  We conclude that it does and, in doing so, reject the argument that such an election can be made simply by recording a new declaration that might be interpreted to adopt the provisions of CCIOA.

¶ 3     Therefore, we affirm the trial court's grant of summary judgment in favor of defendants, Brooks Towers Residences Condominium Association, Inc. (the Association) and its individual board members, on a declaratory judgment claim brought by two residents, Anthony T. Accetta and Nancy Accetta, under CCIOA. We also affirm the trial court's grant of summary judgment in favor of defendants on the Accettas' common law claims.  Finally, we

1

conclude that defendants are entitled to recover their attorney fees for this appeal under section 38-33.3-123(1)(c), C.R.S. 2020, and we remand the case to the trial court to determine the amount of such fees and award them to defendants.

## I. Background

¶ 4    Through their claims in this case, the Accettas challenge the allocation of common expenses among units in Brooks Towers, a high-rise condominium building in downtown Denver.

¶ 5    Magna Associates (Magna) acquired the building in the 1970s. At that time, it was a residential apartment building with a handful of commercial spaces.

¶ 6    In 1979, Magna recorded a declaration and map submitting the building to condominium ownership under the Condominium Ownership Act (COA), section 38-33-101 to -113, C.R.S. 2020. The 1979 declaration named the community Brooks Towers Condominiums and divided the building into 518 units (514 residential and 4 commercial units). Magna didn't sell the units at that time but continued to rent them to tenants. Nor, it seems, did Magna create "The Brooks Towers Condominiums Association, Inc." referenced in the 1979 declaration.

¶ 7     In the early 1990s, Magna had to sell its assets and distribute

its funds, as its formation documents required it to terminate on a

certain date.  To facilitate these tasks, Magna transitioned to the

Magna Associates Liquidating Trust (the Trust), which remodeled

the common spaces, converted some spaces into additional units,

and sold all the units to third parties.

¶ 8     In 1995, before selling the units, the Trust, acting as the

declarant, executed and recorded an "Amended and Restated

Declaration" and an amended map.  The 1995 declaration states

that it "shall totally replace and supersede the [1979] declaration."

Through the 1995 declaration, the Trust changed the community's

name to Brooks Tower Residences, increased the number of units to

854 (526 residential, 33 commercial, and 295 parking units), and

designated the Association (which had been created in 1994 under

the new name, Brooks Tower Residences Condominium Association,

Inc.) to manage the community.[1]

---

[1] Notwithstanding that the Association's name is Brooks Tower Residences Condominium Association, Inc., it was sued and has participated in this case under the name Brooks Towers Residences Condominium Association, Inc. (with an "s" at the end of Tower).

¶ 9    The 1995 declaration makes several references to CCIOA, which had become effective on July 1, 1992.  *See* Ch. 283, sec. 2, 1991 Colo. Sess. Laws 1757.  For example, it

- provides that the "Declarant does hereby submit the Project to condominium ownership pursuant to [CCIOA]";

- states that "[t]he provisions of this Declaration shall be in addition and supplemental to [CCIOA] and to all other provisions of law"; and

- includes a section providing information about the property "in compliance with certain of the requirements set forth in Section 205 of [CCIOA]."

¶ 10    An attachment to the 1995 declaration specifies the allocations of undivided interests for each unit.  The declaration explains that those percentages are based on the units' relative values, as determined by the Trust as of the date of the declaration.  The declaration also obligates unit owners to pay assessments, imposed by the Association against each unit in accordance with the unit's ownership percentage, to meet the common expenses.

¶ 11    The Accettas purchased Unit 3D in 2005.  Under the 1995 declaration, Unit 3D's percentage of ownership in the common

4

elements was less than 0.3 percent — less than some units but significantly higher than many others. As a result, the Accettas pay higher monthly dues and are assessed higher amounts for large projects than many other unit owners.

¶ 12 The special warranty deed that conveyed Unit 3D to the Accettas states that the unit is subject to the 1995 declaration. The Accettas maintain, however, that they didn't read the declaration before purchasing the unit, weren't provided a copy of the list of percentage interests or any other documentation showing the allocations for other units, and didn't learn of the differentials in unit allocations until several years later.

¶ 13 In 2017, after learning of those differentials, the Accettas filed this case. They sought a declaration that the 1995 declaration's allocation provisions are invalid under three provisions of CCIOA: (1) section 38-33.3-207(2), C.R.S. 2020, which requires a declaration to state the formulas used to establish allocations of interests; (2) section 38-33.3-112(1), C.R.S. 2020, which permits a court to refuse to enforce an unconscionable clause in a contract relating to a common interest community; and (3) section 38-33.3-113, C.R.S. 2020, which imposes an obligation of good

faith in the performance of every contract or duty governed by CCIOA. They also brought common law claims for breach of fiduciary duty, conversion, unjust enrichment, and negligence.

¶ 14    Earlier in the case, the trial court ordered that all the other unit owners were indispensable parties who had to be joined in the case. The supreme court reviewed that order under C.A.R. 21 and concluded that joinder was not necessary. *Accetta v. Brooks Towers Residences Condo. Ass'n,* 2019 CO 11, ¶ 3.[2]

¶ 15    Later, on cross-motions by the parties, the trial court issued three orders resolving the Accettas' claims.

¶ 16    In the first order, the court issued a legal determination under C.R.C.P. 56(h) that Brooks Towers is not governed by the entirety of CCIOA. The court reasoned that the community was formed in 1979 under COA, there was never any election for treatment as a post-CCIOA community through the procedures outlined in section 38-33.3-118, and such an election couldn't be effectuated by other means, including by adopting and recording a new declaration.

---

[2] At the time of the supreme court's review of the joinder issue, Mr. Accetta was the only plaintiff in the case. Ms. Accetta was later joined as an additional plaintiff.

6

¶ 17    In the second order, the court granted in part the individual defendants' summary judgment motion, concluding that the Accettas could pursue their CCIOA declaratory judgment claim but not their common law claims against the individual defendants. As to the common law claims, the court reasoned that, under various provisions of law and the Association's governing documents, "none of the individually-named Defendants can be held liable in tort for any of the damage claims asserted against them."

¶ 18    In the third order, the court granted defendants' motion for summary judgment and denied the Accettas' cross-motion for summary judgment. The court concluded that the Accettas' CCIOA declaratory judgment claim failed as a matter of law because the community isn't subject to the entirety of CCIOA or to the specific CCIOA provisions at issue, and, even if those provisions applied, the 1995 declaration didn't violate them. The court also concluded that the Accettas' common law claims failed as a matter of law because defendants had no duty to adjust the allocations set by the 1995 declaration and the Accettas were on record notice of those allocations when they purchased their unit.

¶ 19    The Accettas challenge the first and third orders in this appeal but do not challenge the second order.

## II.    Analysis

¶ 20    The Accettas contend the trial court erred in three ways: (1) by concluding that Brooks Towers isn't governed by CCIOA; (2) by holding that the 1995 declaration doesn't violate certain provisions of CCIOA; and (3) by entering summary judgment in defendants' favor on the Accettas' common law claims.

¶ 21    We disagree with the Accettas on the first issue.  Because we conclude that Brooks Towers isn't subject to the CCIOA provisions the Accettas claim the 1995 declaration violates, we don't address the second issue.  We also disagree with the Accettas on the third issue.  Finally, we consider the parties' competing requests for appellate attorney fees.

### A.    Legal Principles and Standard of Review

¶ 22    The trial court issued its two disputed orders under C.R.C.P. 56(h) and (c), respectively.

¶ 23    C.R.C.P. 56(h) allows a court to address issues of law that are not dispositive of a claim but nonetheless will significantly impact the way the case proceeds.  *Coffman v. Williamson,* 2015 CO 35,

¶ 11.  An order is appropriate under the rule "[i]f there is no genuine issue of any material fact necessary for the determination of the question of law."  *Id.* at ¶ 12 (quoting C.R.C.P. 56(h)).

¶ 24    Summary judgment under C.R.C.P. 56(c) is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Ryan Ranch Cmty. Ass'n v. Kelley*, 2016 CO 65, ¶ 23.

¶ 25    We review decisions under both provisions of Rule 56 de novo.  *Id.*; *Coffman*, ¶ 12.

¶ 26    We likewise review de novo a trial court's interpretation of recorded instruments.  *Ryan Ranch*, ¶ 24.  We give the words and phrases their common meanings and, where an instrument's meaning is clear, we enforce it as written.  *Pulte Home Corp. v. Countryside Cmty. Ass'n*, 2016 CO 64, ¶ 23.

¶ 27    The meaning and effect of statutory provisions are also questions of law that we review de novo.  *Ryan Ranch*, ¶ 25.  When interpreting a statute, our primary goal is to ascertain and give effect to the General Assembly's intent.  *Lewis v. Taylor*, 2016 CO 48, ¶ 20.  "In interpreting a statute, we look to 'the entire statutory scheme to give consistent, harmonious, and sensible effect to all

9

parts' and apply 'words and phrases according to their plain and ordinary meaning.'" *Pulte Home Corp.*, ¶ 24 (quoting *Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1089 (Colo. 2011)). "Where the statute's language is clear, we apply it as written." *Id.*

### B. CCIOA Declaratory Judgment Claim

¶ 28 We first address the issue at the heart of this dispute: whether Brooks Towers is governed by the provisions of CCIOA the Accettas claim the 1995 declaration violates. We conclude that it is not. In doing so, we reject the Accettas' three arguments for application of CCIOA: (1) that the 1995 declaration created an entirely new common interest community; (2) that the 1995 declaration elected treatment under CCIOA; and (3) that the 1995 declaration incorporated some of the relevant provisions of CCIOA.[3]

### 1. Creation of a New Community Under the 1995 Declaration

¶ 29 We first reject the Accettas' argument that Brooks Towers isn't a pre-existing community that falls outside the scope of much of

---

[3] The Accettas also highlight the fact that in the early stages of this case, defendants argued that CCIOA applied and barred the Accettas' claims. They don't make any legal argument based on that fact, however, so we don't consider it.

CCIOA but, instead, became a new community subject to CCIOA when it adopted a new declaration in 1995.

¶ 30    CCIOA automatically applies in its entirety to common interest communities "created" in the state after CCIOA's effective date of July 1, 1992. § 38-33.3-115, C.R.S. 2020. It generally does not apply to communities created before its effective date. § 38-33.3-117(3), C.R.S. 2020; *see also DA Mountain Rentals, LLC v. Lodge at Lionshead Phase III Condo. Ass'n*, 2016 COA 141, ¶ 28. There are two important exceptions, however. First, under section 38-33.3-117, pre-existing communities are automatically subject to certain provisions in CCIOA. *DA Mountain Rentals*, ¶ 28. Second, under section 38-33.3-118, associations for pre-existing communities may elect to be governed by CCIOA in its entirety. *DA Mountain Rentals*, ¶ 28.

¶ 31    A common interest community is "created" for purposes of CCIOA by recording a declaration and a plat or map and conveying the real estate subject to the declaration to the association. § 38-33.3-201(1), C.R.S. 2020; *see also Pulte Home Corp.*, ¶¶ 41-44. By contrast, COA doesn't set forth any specific requirements for the

11

creation of a common interest community under that statutory scheme.

¶ 32 Nonetheless, we agree with the trial court that Brooks Towers was created as a common interest community in 1979. The question, then, is whether the amendment of the bylaws in 1995 effectively created a "new" common interest community in place of the earlier one. We conclude that it did not.

¶ 33 In doing so, we reject the Accettas' argument that the 1995 declaration, by "totally replac[ing] and supersed[ing]" the 1979 declaration, created an entirely new common interest community. The 1995 declaration may have supplanted the terms of the 1979 declaration, but it didn't nullify the 1979 declaration as if the earlier declaration had never existed. Nor did it create a new common interest community where there wasn't one before.

¶ 34 Critically, both declarations describe the same real estate. Under CCIOA, a "common interest community" is "real estate described in a declaration with respect to which a person, by virtue of such person's ownership of a unit, is obligated to pay for real estate taxes, insurance premiums, maintenance, or improvement of other real estate described in a declaration." § 38-33.3-103(8),

C.R.S. 2020.  And "real estate" is "any leasehold or other estate or interest in, over, or under land, including structures, fixtures, and other improvements and interests that, by custom, usage, or law, pass with a conveyance of land though not described in the contract of sale or instrument of conveyance."  § 38-33.3-103(25).

¶ 35    Here, the real estate — the property interests in the land upon which the condominium building sits and in the structures, fixtures, and other improvements on that land — didn't fundamentally change between the 1979 and the 1995 declarations. Both declarations create a community of common ownership.  Both provide the same legal description of the land.  Both pertain to the same high-rise condominium building.  And, while the Trust renovated portions of the building and created additional units before recording the 1995 declaration, the structure was largely the same, as were many of the units within that structure.

¶ 36    It cannot be that any time a common interest community makes improvements to a building, modifies or adds units or common areas, amends its declaration, or changes its name, it automatically becomes a new community under CCIOA.  Such a rule would bring uncertainty into application of CCIOA, contrary to

13

its legislative purposes. *See* § 38-33.3-102(1)(a), C.R.S. 2020 ("[I]t is in the best interests of the state and its citizens to establish a clear, comprehensive, and uniform framework for the creation and operation of common interest communities."). It also would disrupt CCIOA's specific procedures for election into governance by its provisions, as discussed in the next section, and for termination of existing communities. *See* § 38-33.3-218, C.R.S. 2020. Accordingly, we decline to adopt such a rule.

### 2. Election into the Provisions of CCIOA

¶ 37 Next, we reject the Accettas' argument that, through its repeated references to CCIOA, the 1995 declaration effectively elected into treatment under CCIOA.

¶ 38 Section 38-33.3-118 — which, pursuant to section 38-33.3-117(1)(e), applies to pre-existing common interest communities as to events and circumstances occurring on or after July 1, 1992 — provides two methods an association for a pre-existing community may use to elect to be governed by CCIOA in its entirety. Under the first method,

> [i]f there are members or stockholders entitled
> to vote thereon, the board of directors may
> adopt a resolution recommending that such

14

association accept this article and directing that the question of acceptance be submitted to a vote at a meeting of the members or stockholders entitled to vote thereon, which may be either an annual or special meeting. The question shall also be submitted whenever one-twentieth, or, in the case of an association with over one thousand members, one-fortieth, of the members or stockholders entitled to vote thereon so request. Written notice stating that the purpose, or one of the purposes, of the meeting is to consider electing to be treated as a common interest community organized after June 30, 1992, and thereby accepting the provisions of this article, together with a copy of this article, shall be given to each person entitled to vote at the meeting within the time and in the manner provided in the articles of incorporation, declaration, bylaws, or other governing documents for such association for the giving of notice of meetings to members. Such election to accept the provisions of this article shall require for adoption at least sixty-seven percent of the votes that the persons present at such meeting in person or by proxy are entitled to cast.

§ 38-33.3-118(1)(a). Alternatively,

[i]f there are no persons entitled to vote thereon, the election to be treated as a common interest community under this article may be made at a meeting of the board of directors pursuant to a majority vote of the directors in office.

§ 38-33.3-118(1)(b).

15

¶ 39    Under either method, certain officers of the association must execute and record a statement of election setting forth the name of the common interest community and association, the fact that the association has elected to accept the provisions of CCIOA, and information concerning the association's compliance with one of the two methods for electing into CCIOA.  § 38-33.3-118(2)-(3).  Only when that statement of election is recorded does the election become effective.  § 38-33.3-118(4).

¶ 40    The meaning of these provisions is clear.  The General Assembly has established specific procedures that associations must follow if they want to elect treatment under CCIOA — and only through those procedures can such an election be effectuated.

¶ 41    Notably, although the General Assembly modeled much of CCIOA on the Uniform Common Interest Ownership Act (Unif. L. Comm'n 2014) (UCIOA), *see Pulte Home Corp.*, ¶ 43 n.5, section 38-33.3-118 is unique to Colorado.  It was modeled after statutory sections setting forth the procedures for pre-existing corporate entities to elect into the provisions of the Colorado Revised Nonprofit Corporation Act.  *See* Staff Summary of Hearing on H.B. 91-1292 before the H. Comm. on Judiciary, 58th Gen. Assemb., 1st

16

Reg. Sess. (Feb. 12, 1991), attach. A (Memorandum from James L. Winokur on Proposed Colorado Common Interest Ownership Act: Background & Summary of Basic Provisions 39-40 (Feb. 1990)); *see also* §§ 7-137-201 to -204, C.R.S. 2020.

¶ 42　This suggests that the General Assembly wanted to tailor CCIOA to give associations for pre-existing common interest communities an option to elect treatment under CCIOA. But the specificity of Colorado's unique provisions suggests that the General Assembly also wanted to be deliberate about exactly how such an election could be made and what kind of notice would need to be recorded to advise others of the election.

¶ 43　We therefore conclude that section 38-33.3-118 provides the exclusive mechanism by which an association for a pre-existing common interest community can elect to be governed by the entirety of CCIOA. This interpretation comports with the plain language of this provision. It also comports with the general language in CCIOA stating that, "[e]xcept as expressly provided in this article, provisions of this article may not be varied by agreement, and rights conferred by this article may not be waived." § 38-33.3-104, C.R.S. 2020.

¶ 44    Our decision is in line with recent supreme court cases strictly enforcing other procedural requirements set forth in CCIOA.  For instance, in *Ryan Ranch*, ¶¶ 33, 51, the court held, based in part on section 38-33.3-104, that an association didn't annex property into a common interest community when it didn't comply with the procedures specified in CCIOA for doing so.  And in *Perfect Place, LLC v. Semler*, 2018 CO 74, ¶ 48, the court held that the owner of a garage unit didn't subdivide that unit when he didn't comply with the procedures specified in CCIOA for doing so.  While the supreme court hasn't expressly held that CCIOA provisions always require strict compliance, its decisions certainly suggest that, at the least, substantial compliance with a CCIOA-established procedure is necessary.  *See, e.g., id.*  And adopting a declaration that vaguely refers to CCIOA but doesn't expressly elect treatment under CCIOA, without following the specified procedures for approving and filing a statement of election, doesn't comply with the statutory process "in any meaningful sense."  *Id.*

¶ 45    Our decision also aligns with CCIOA's statutory purpose "to establish a clear, comprehensive, and uniform framework for the creation and operation of common interest communities."

§ 38-33.3-102(1)(a). This purpose is best served by applying the statute as written — that is, to require that associations for pre-existing communities follow the specified procedure if they wish to be governed by the entirety of CCIOA. That way, members and stockholders can be ensured notice and an opportunity to vote on the issue; potential buyers and other interested parties can review the recordings relating to the property to confirm which statutory regime applies; and associations can be assured that they won't inadvertently subject themselves to CCIOA any time they amend their declarations, without carefully weighing the consequences of such a change. *See generally* William C. Jensen & Cynthia L. McNeill, *Colorado Common Interest Ownership Act — How It Is Doing*, 25 Colo. Law. 17, 20 (Nov. 1996) ("[T]he decision to elect into CCIOA or to remain subject to COA requires close examination of the rights and liabilities contained in the declaration, focusing on how an election into CCIOA will either enhance or destroy the rights contained therein.").

¶ 46    We share the trial court's concerns that the protections and predictability provided by section 38-33.3-118 would "evaporate" if courts "were allowed to peruse amended declarations for evidence

19

that the board of directors of a pre-existing condominium intended to become subject to the CCIOA even though they never proposed or adopted a formal resolution to do so."

¶ 47    We also note that allowing associations for pre-existing communities to elect into CCIOA simply by filing an amended declaration could enable some associations to avoid the onerous requirements set forth in CCIOA for making such an election. Where members or stockholders are entitled to vote, for a proposed election into CCIOA to pass, section 38-33.3-118(1)(a) requires an affirmative vote by at least sixty-seven percent of those persons who cast a vote. Yet a declaration might require far fewer votes to approve declaration amendments. Indeed, COA doesn't dictate the requirements for amendment of a declaration. *See* §§ 38-33-105.5, 38-33-106, C.R.S. 2020. And a provision of CCIOA, which applies to pre-existing communities for declaration amendments made on or after January 1, 2006, allows for amendments with as little as a simple majority of the votes in the association — or less if all units are restricted to nonresidential use. § 38-33.3-217(1)(a)(I), C.R.S. 2020; *see also* § 38-33.3-117(1.5)(d).

¶ 48    We reject the Accettas' argument that dicta in *B.B. & C. Partnership v. Edelweiss Condominium Ass'n*, 218 P.3d 310 (Colo. 2009), suggests the amendment of a declaration can automatically trigger application of the entirety of CCIOA.  The supreme court's opinion in that case merely notes that COA controlled the issues in the case "because the Declaration creating [the community] was recorded in 1970 and the relevant events transpired before the 2003 Amended Declaration was recorded."  *Id.* at 315.  The opinion doesn't cite section 38-33.3-118 and doesn't consider the process the association would need to follow to elect treatment under CCIOA.  *See id.*  Thus, it has no bearing on this issue.

¶ 49    Finally, we reject the Accettas' argument that the statutory requirements don't apply in this case because the association contemplated in the 1979 declaration was never formed and, in the absence of any voting members or board of directors, there would've been no way to accomplish the procedures in section 38-33.3-118.  Had Magna wished for the common interest community to become subject to the entirety of CCIOA, it could've formed the association and board of directors and then proceeded to follow the section 38-33.3-118 procedures.  It didn't do so.

¶ 50    For all these reasons, we conclude that, irrespective of the 1995 declaration's repeated references to CCIOA, the recording of that declaration did not elect treatment under CCIOA as contemplated by section 38-33.3-118.

### 3.    Opting into Portions of CCIOA

¶ 51    We also reject the Accettas' argument that the 1995 declaration incorporated one of the CCIOA requirements they claim has been violated.  Specifically, they argue that the declaration incorporated the requirements of section 38-33.3-205, C.R.S. 2020, which, in turn, incorporates the requirements of section 38-33.3-207.  We disagree for two reasons.

¶ 52    First, we disagree with the Accettas' premise that section 38-33.3-120, C.R.S. 2020, provides a means for associations for pre-existing communities to adopt all or large parts of CCIOA without undergoing the procedures outlined in section 38-33.3-118.

¶ 53    Section 38-33.3-120(1) provides,

> [i]n the case of amendments to the declaration, bylaws, or plats and maps of any common interest community created within this state before July 1, 1992, which has not elected treatment under this article pursuant to section 38-33.3-118:

22

(a) If the substantive result accomplished by the amendment was permitted by law in effect prior to July 1, 1992, the amendment may be made either in accordance with that law, in which case that law applies to that amendment, or it may be made under this article; and

(b) If the substantive result accomplished by the amendment is permitted by this article, and was not permitted by law in effect prior to July 1, 1992, the amendment may be made under this article.

*See also* § 38-33.3-117(1)(f) (applying section 38-33.3-120 to pre-existing communities for events and circumstances occurring on or after July 1, 1992).

¶ 54    This provision, like the UCIOA provision on which it is based, "does not permit a pre-existing common interest community to elect to come entirely within the provisions of the Act, disregarding old law." UCIOA § 1-206 cmt. 6; *see also Arrabelle at Vail Square Residential Condo. Ass'n v. Arrabelle at Vail Square LLC*, 2016 COA 123, ¶ 15 ("CCIOA is patterned after the [UCIOA], and 'we accept the intent of the drafters of a uniform act as the General Assembly's intent when it adopts a uniform act.'" (quoting *Yacht Club II Homeowners Ass'n v. A.C. Excavating*, 94 P.3d 1177, 1180 (Colo.

App. 2003))). Nor does it permit an association for a pre-existing community to elect to come within some portions of CCIOA.

¶ 55    Instead, this provision enables associations for pre-existing communities to amend their declarations to add provisions that would've been prohibited by pre-existing law but are permitted under CCIOA. *See, e.g., DA Mountain Rentals,* ¶¶ 29-31; *Giguere v. SJS Fam. Enters., Ltd.,* 155 P.3d 462, 467-69 (Colo. App. 2006); UCIOA § 1-204 cmt. 2 ("[U]nder Section 1-206, owners of 'old' common interest communities may amend any provisions of their declaration or bylaws, even if the amendment would not be permitted by 'old' law, so long as (a) the amendment is adopted in accordance with the procedure required by 'old' law and the existing declaration and bylaws, and (b) the substance of the amendment does not violate this Act."); UCIOA § 1-206 cmt. 1 ("This section . . . provides a straightforward mechanism by which the documents of pre-Act common interest communities may be amended to take advantage of desirable provisions of the Act.").

¶ 56    Second, even if an association could adopt portions of CCIOA through a declaration, the 1995 declaration doesn't evince any intent to incorporate the requirements of section 38-33.3-205 or,

through it, section 38-33.3-207. As the trial court noted, the declaration refers to section 38-33.3-205 only one time; that one "casual reference" (which provides that, "[i]n compliance with certain of the requirements set forth in Section 205 of [CCIOA], Declarant hereby states as follows," before addressing various topics section 38-33.3-205 requires to be in all declarations) doesn't signify an intent to be bound by section 38-33.3-205 where CCIOA didn't otherwise apply; and the declaration makes no reference whatsoever to section 38-33.3-207, the section the declaration supposedly violates.

### 4. Compliance With CCIOA

¶ 57 We have concluded that Brooks Towers isn't governed by CCIOA, either generally or as to the specific provisions at issue. And the provisions of CCIOA that the Accettas claim to have been violated — sections 38-33.3-112, 38-33.3-113, and 38-33.3-207 — aren't ones that section 38-33.3-117 automatically applies to pre-existing communities like Brooks Towers. Therefore, the 1995 declaration isn't subject to these provisions, and we don't consider Brooks Towers' compliance with them.

25

## C.    Common Law Claims

¶ 58    We next address the Accettas' argument that the trial court erred by entering summary judgment in defendants' favor on their remaining claims for breach of fiduciary duty, conversion, unjust enrichment, and negligence.  They assert that these claims survive even if CCIOA doesn't apply.  We disagree.

¶ 59    The Accettas concede that if their CCIOA declaratory judgment claim fails, their unjust enrichment claim fails as well.  We therefore address only their other three common law claims.  We also limit our consideration to the claims asserted against the Association, because the Accettas don't challenge the dismissal of the common law claims against the individual defendants.

¶ 60    As alleged in the complaint, the breach of fiduciary duty, conversion, and negligence claims are all based on imposition of excessive fees against the Accettas' unit and failure to disclose the relative amount of the fees as compared to other units.

¶ 61    Yet the Accettas haven't established the excessiveness of the fees under any applicable provision of CCIOA, they haven't argued excessiveness under COA, and they haven't articulated any other legal basis for concluding that the fees were excessive or that the

Association had an obligation to ignore the allocations in the 1995 declaration in assessing fees. Indeed, the declaration obligates the Association to assess fees in accordance with the allocations adopted as part of that declaration.

¶ 62 Additionally, the Accettas' claims regarding disclosure of the fee differentials among units fail because the recorded declaration sets out the allocations for each unit. Thus, the Accettas were on constructive notice of the fee allocations for all units as far back as 1995. *See Chateaux Condos. v. Daniels*, 754 P.2d 425, 426-27 (Colo. App. 1988) (a condominium association's recorded declaration put a unit owner on constructive notice that he was liable for unpaid common expenses assessed against his unit).

¶ 63 The Accettas argue that improper resolutions and declaration amendments (unrelated to the fee allocations) also support their claims. But, while the complaint briefly alludes to those actions, it doesn't allege them as a basis for any of the common law claims. Therefore, we don't consider them. *See Wibby v. Boulder Cnty. Bd. of Cnty. Comm'rs*, 2016 COA 104, ¶ 20 (declining to consider an argument that wasn't alleged in the complaint).

## D. Attorney Fees

¶ 64 Finally, we consider the parties' competing requests for attorney fees for this appeal. We deny the Accettas' request because they are not the prevailing parties. However, we grant defendants' request.

¶ 65 Section 38-33.3-123(1)(c) — which, under section 38-33.3-117(1)(g), applies to pre-existing common interest communities for events and circumstances occurring on or after July 1, 1992 — provides that "[i]n any civil action to enforce or defend the provisions of this article or of the declaration, bylaws, articles, or rules and regulations, the court shall award reasonable attorney fees, costs, and costs of collection to the prevailing party."

¶ 66 We conclude that section 38-33.3-123(1)(c) requires an award of appellate attorney fees to defendants as the prevailing parties in this civil action to enforce the provisions of CCIOA. All of the Accettas' claims, including the declaratory judgment claim and the common law claims, were premised on violations of CCIOA. And while we ultimately rejected those claims based on our conclusion that Brooks Towers isn't governed by CCIOA, section 38-33.3-123(1)(c) still applies because the Accettas brought the

action to enforce CCIOA's provisions. Accordingly, an award of fees under that section is required. *See Cody Park Prop. Owners' Ass'n v. Harder*, 251 P.3d 1, 8 (Colo. App. 2009); *Giguere*, 155 P.3d at 472.

¶ 67 Pursuant to C.A.R. 39.1, we exercise our discretion to remand the case to the trial court to determine the amount of reasonable appellate fees to be awarded to defendants.

### III. Conclusion

¶ 68 The judgment is affirmed, and the case is remanded to the trial court to determine the amount of defendants' reasonable appellate attorney fees and award such fees to defendants.

JUDGE FURMAN and JUDGE TOW concur.