The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
December 28, 2023

**2023COA125**

**No. 22CA2103 & 23CA0372, *Seaman v. Heather Gardens* —
Real Property — Colorado Common Interest Ownership Act —
Association Records**

In this civil action involving the Colorado Common Interest

Ownership Act (CCIOA), §§ 38-33.3-101 to -402, C.R.S. 2023, a

division of the court of appeals determines, as a matter of first

impression, that a unit owners' association's bank statements may

constitute "[d]etailed records of receipts and expenditures affecting

the operation and administration of the association" under section

38-33.3-317(1)(a), C.R.S. 2023.  The division further concludes that

records generated by a third party, such as a bank, may be records

an association "maintain[s]" and must make available for

examination and copying by a unit owner under section 38-33.3-

317(2).  Thus, the division concludes that the district court erred by

dismissing plaintiff's amended complaint on the basis that bank statements cannot, as a matter of law, be records that a unit owners' association is required to maintain and produce for inspection to a unit owner under section 38-33.3-317(1)(a) and (2). Consequently, the division reverses the judgment dismissing plaintiff's complaint and remands for further proceedings.

COLORADO COURT OF APPEALS                                    **2023COA125**

Court of Appeals Nos. 22CA2103 & 23CA0372
Arapahoe County District Court No. 22CV31637
Honorable Elizabeth Beebe Volz, Judge

Thomas Seaman,

Plaintiff-Appellant,

v.

Heather Gardens Association, a Colorado nonprofit corporation,

Defendant-Appellee.

JUDGMENT AND ORDER REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE BROWN
Tow and Schock, JJ., concur

Announced December 28, 2023

Robinson Waters & O'Dorisio, P.C., Kimberly A. Bruetsch, Mike Lazar, Denver, Colorado, for Plaintiff-Appellant

The Hustead Law Firm, Patrick Q. Hustead, Aaron M. Bell, Jason J. Patel, Denver, Colorado, for Defendant-Appellee

¶ 1    The legislature enacted the Colorado Common Interest Ownership Act (CCIOA), §§ 38-33.3-101 to -402, C.R.S. 2023, in part to "establish a clear, comprehensive, and uniform framework for the creation and operation of common interest communities." § 38-33.3-102(1)(a), C.R.S. 2023.  Common interest communities are managed by unit owners' associations organized under section 38-33.3-301, C.R.S. 2023.

¶ 2    Section 38-33.3-317, C.R.S. 2023, provides that unit owners are entitled to reasonable access to information about the operation, administration, and finances of their unit owners' association.  To that end, section 38-33.3-317(1) obligates an association to "maintain" eighteen categories of records — in addition to any records specifically defined in the association's declaration or bylaws, or expressly required by section 38-33.3-209.4(2), C.R.S. 2023 — "for purposes of document retention and production to owners."  § 38-33.3-317(1)(a)-(p).

¶ 3    Plaintiff, Thomas Seaman, appeals the district court's order dismissing his complaint against defendant, Heather Gardens

1

Association (HGA).[1]  Seaman sought an injunction compelling HGA to make certain bank statements available to him for examination under CCIOA.[2]  He contends that the court erred by dismissing his complaint on the basis that section 38-33.3-317 does not require HGA to produce the bank statements.

¶ 4      Resolving Seaman's contention requires us to determine, as a matter of first impression, whether bank statements may be "[d]etailed records of receipts and expenditures affecting the operation and administration of the association" under section 38-33.3-317(1)(a).  Based on the plain language of the statute, we conclude that bank statements may constitute such records.  We further conclude that records generated by a third party, such as a bank, may be records an association "maintain[s]" and must make available for examination and copying by a unit owner under section 38-33.3-317(2)(a).  Consequently, we conclude that the

---

[1] Our references to Seaman's complaint are to his first amended complaint, which is the operative complaint.
[2] Seaman's complaint also requested a penalty under section 38-33.3-317(4.5), C.R.S. 2023, which states that an association must allow inspection or copying of the applicable records within thirty days or be subject to penalties.  That claim is not before us on appeal and should be addressed on remand.

district court erred by dismissing Seaman's complaint under C.R.C.P. 12(b)(5). We reverse the judgment and remand for further proceedings.[3]

### I. Background and Procedural History

¶ 5 HGA is a nonprofit corporation that manages Heather Gardens, an age-restricted senior living community. The parties agree that HGA is subject to CCIOA and that Seaman is a property owner and resident of Heather Gardens. *See* § 38-33.3-103(3), (31), C.R.S. 2023.

¶ 6 According to Seaman's complaint, in April 2020, HGA applied for a loan under the Paycheck Protection Program (PPP) and received funds in the amount of $1,085,800. It opened a new account at KeyBank to hold and manage the PPP funds. And in July 2021, it applied for and received forgiveness of the PPP loan.

¶ 7 In June 2022, Seaman requested copies of HGA's records including, as relevant here, bank statements for the KeyBank account in which it held the PPP funds. HGA provided Seaman

---

[3] Because we reverse on this basis, we decline to address Seaman's alternative argument that section 38-33.3-317(2) requires an association to produce "all records" it maintains, regardless of whether such records fall within a category listed in subsection (1).

with copies of balance sheets showing the PPP funds as an asset titled "Cash – Key Bank PPP Proceeds" with varying balances, but it declined to provide the bank statements, explaining that "[b]ank statements are not records of the association that must be kept or made available for inspection/copying by owners."

¶ 8    In August, Seaman filed a complaint in the district court seeking an injunction requiring HGA to produce the requested bank statements.  HGA moved to dismiss under C.R.C.P. 12(b)(5), arguing that section 38-33.3-317 does not require it to maintain or produce bank statements for inspection and copying.  It further argued that the statute does not require it to maintain and make available records created by a third party, such as a bank.

¶ 9    The district court granted the motion to dismiss, concluding that bank statements "[c]learly" are not "[d]etailed records of receipts and expenditures affecting the operation and administration of the association" under section 38-33.3-317(1)(a) and are not otherwise listed among the categories of records an

association is required to maintain under subsection (1).[4] The court acknowledged that the purpose of section 38-33.3-317 is "to provide owners with access to information about the operation of the association and how its funds are generated and spent," but it reasoned that Seaman had received sufficient records from HGA "related to the receipt of PPP funds, the amount of the funds received, the accounts in which the funds were held and when those funds were transferred from one account to another," and that HGA's refusal to provide the bank statements did not "interfere with [Seaman's] right to receive the relevant information."

## II. Analysis

¶ 10    Seaman contends that the district court erred by concluding that bank statements are not, as a matter of law, "[d]etailed records of receipts and expenditures affecting the operation and administration of the association" under section 38-33.3-317(1)(a).

---

[4] The district court also concluded that the requested bank statements did not constitute "[f]inancial statements as described in section 7-136-106, C.R.S. [2023]," § 38-33.3-317(1)(g), or "[f]inancial records sufficiently detailed to enable the association to comply with section 38-33.3-316(8)[, C.R.S. 2023]," § 38-33.3-317(1)(j). It does not appear that Seaman ever argued that the requested bank statements meet either of these definitions, and he does not challenge that part of the court's ruling on appeal.

5

We agree. We also conclude that, even though they are generated by a third party, bank statements may be "maintained by the association" such that they must be made available for examination and copying by a unit owner under section 38-33.3-317(2). Thus, we conclude that the court erred by dismissing Seaman's complaint under C.R.C.P. 12(b)(5).

## A. Standard of Review and Generally Applicable Law

¶ 11    We review de novo a district court's judgment dismissing a complaint for failure to state a claim upon which relief can be granted under C.R.C.P. 12(b)(5). *Nieto v. Clark's Mkt., Inc.*, 2021 CO 48, ¶ 11. We accept as true the factual allegations in the complaint and, viewing them in the light most favorable to the plaintiff, determine whether the complaint states a plausible claim for relief. *See id.*; *Warne v. Hall*, 2016 CO 50, ¶¶ 9, 24.

¶ 12    We also review de novo issues of statutory construction. *Nieto*, ¶ 12. In doing so, our primary task is to give effect to the legislative intent as reflected in the plain and ordinary meanings of the words and phrases used. *Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc.*, 2019 CO 51, ¶ 40. We read the statute in the context of the entire statutory scheme, giving consistent and sensible effect to all

6

its parts. *Id.*; *see also* §§ 2-4-101, -201, C.R.S. 2023; *A.M. v. A.C.*, 2013 CO 16, ¶ 8. And we avoid constructions that would render any words or phrases superfluous or lead to illogical or absurd results. *Dep't of Revenue v. Agilent Techs., Inc.*, 2019 CO 41, ¶ 16. When the language of a statute is clear, we enforce it as written. *Elder v. Williams*, 2020 CO 88, ¶ 18.

## B. The Bank Statements May Be Detailed Records of Receipts and Expenditures Affecting the Operation and Administration of an Association

¶ 13    As noted, section 38-33.3-317(1) obligates an association to "maintain" eighteen categories of records "for purposes of document retention and production to owners." § 38-33.3-317(1)(a)-(p). Under section 38-33.3-317(2), "all records maintained by the association must be available for examination and copying by a unit owner or the owner's authorized agent" in accordance with prescribed procedures. Furthermore, "the association may not condition the production of records upon the statement of a proper purpose." *Id.*

¶ 14    Seaman contends that bank statements fall into one of the categories of records an association is required by statute to maintain and make available to him as a unit owner: "[d]etailed

7

records of receipts and expenditures affecting the operation and administration of the association." § 38-33.3-317(1)(a). Based on the statute's plain language, we agree that bank statements may constitute such records.

¶ 15    The relevant terms are not defined in CCIOA. But because they are words in common usage and "people of ordinary intelligence needn't guess at [their] meaning," we consider their dictionary definitions. *Butler v. Bd. of Cnty. Comm'rs*, 2021 COA 32, ¶ 14; *see Broomfield Senior Living Owner, LLC v. R.G. Brinkmann Co.*, 2017 COA 31, ¶ 18 (where a statute fails to define a term, we consider its common usage).

- A "record" is "the state or fact of being recorded" or "something that records." Merriam-Webster Dictionary, https://perma.cc/3H6V-QUWY. To "record" means "to set down in writing" or "furnish written evidence of." *Id.*; *see* Black's Law Dictionary 1527 (11th ed. 2019) (A "record" is "[a] documentary account of past events" or "[i]nformation that is inscribed on a tangible medium or that, having been stored in an electronic or other medium, is retrievable in perceivable form.").

- "Detailed" means "marked by abundant detail or by thoroughness in treating small items or parts." Merriam-Webster Dictionary, https://perma.cc/3QN2-QVFE.

- A "receipt" is "a writing acknowledging the receiving of goods or money," "the act or process of receiving," or "something received." Merriam-Webster Dictionary, https://perma.cc/V287-RKCF; *see* Black's Law Dictionary at 1521 ("Receipt" includes "[a] written acknowledgment that something has been received; esp., a piece of paper or an electronic notification that one has paid for something.").

- "Expenditure" is defined as "the act or process of expending" or "something expended," namely a "disbursement" or "expense." Merriam-Webster Dictionary, https://perma.cc/3MNA-5FRQ. "Expending" is further defined as "to pay out" or "spend." Merriam-Webster Dictionary, https://perma.cc/7JPM-BWER; *see* Black's Law Dictionary at 723 (defining "expenditure" as "[t]he act or process of spending or using money, time, energy, etc.; esp., the disbursement of funds" or as "[a] sum paid out").

9

¶ 16    A bank statement is a "record," in that it sets down in writing information about a bank account.  It is a "detailed record" because it typically provides particulars about the account itself and any transactions occurring on the account — including the date, transaction type, and dollar amount, among other details.  And it is a "detailed record of receipts and expenditures" to the extent it reflects any deposits (receipts of funds) into or withdrawals (expenditures of funds) from the account.[5]

¶ 17    Thus, we conclude that an association's bank statements will typically fall within the unambiguous language of section 38-33.3-317(1)(a).  And because the statutory language is clear, we do not address the parties' policy arguments in favor of or against this interpretation.[6]  *See Samuel J. Stoorman & Assocs., P.C. v.*

---

[5] The parties do not appear to dispute that "receipts" into and "expenditures" from an association's bank account would be transactions "affecting the operation and administration of the association."  § 38-33.3-317(1)(a).

[6] We also do not endeavor to identify every type of record that might satisfy section 38-33.3-317(1)(a).  Indeed, the drafters of the Uniform Common Interest Ownership Act (Unif. L. Comm'n 2021) (UCIOA), on which CCIOA is based, eschewed any attempt to prescribe how an association's financial records must be kept.  *See* Ch. 232, sec. 1, § 38-33.3-317(1), 2012 Colo. Sess. Laws 1016; *Accetta v. Brooks Towers Residences Condo. Ass'n,* 2021 COA 87,

10

*Dixon*, 2017 CO 42, ¶ 11 ("When a statute is unambiguous, public policy considerations beyond the statute's plain language have no place in its interpretation.").

¶ 18     Notably, HGA does not appear to argue that bank statements do not meet the plain and ordinary meaning of the words in subsection (1)(a). Instead, it contends that, had the legislature intended to include bank statements in the "long list" of document categories that an association must maintain and make available, it would have separately listed them. HGA notes that the legislature specified that an association must maintain certain "financial statements," just not the ones Seaman sought. And it argues that interpreting subsection (1)(a) expansively renders these other categories of documents superfluous, pointing specifically to

---

¶ 41 (noting that much of CCIOA was modeled on the UCIOA); UCIOA § 3-118 cmt. 3 ("The subsection generally avoids any substantive requirements as to how the [a]ssociation's financial records are to be maintained, relying simply on the obligation to retain 'detailed records of receipts' . . . ."). And while we have concluded that bank records may be "[d]etailed records of receipts and expenditures," not all "[d]etailed records of receipts and expenditures" are bank statements. § 38-33.3-317(1)(a). In other words, records other than bank statements (e.g., QuickBooks records of income and expenses) may also satisfy the definition. *See id.*

11

subsections (1)(g) and (1)(j). This is the rationale that the district court generally adopted in dismissing Seaman's complaint. But for three reasons, we disagree.

¶ 19    First, to the extent bank statements are already included in one of the eighteen categories of records an association is required to maintain as set forth in subsection (1), the legislature need not have separately listed them. Certain of the eighteen categories are narrow — for example, "[a] list of the names, electronic mail addresses, and physical mailing addresses of its current executive board members and officers," § 38-33.3-317(1)(h), which likely is a single record. But others are quite broad — such as "[r]ecords of claims for construction defects and amounts received pursuant to settlement of those claims," § 38-33.3-317(1)(b), which could include demand letters, litigation-initiating complaints, settlement agreements, check stubs or wire transfer receipts, and other similar documents. Subsection (1)(a) is a broad category. That the legislature did not separately identify every document that might fall within subsection (1)(a) does not mean that documents falling within subsection (1)(a) but not separately identified can be withheld.

¶ 20　Second, the legislature exempted several types of records from mandatory disclosure but did not include an association's bank statements among the exemptions. Section 38-33.3-317(3) identifies seven categories of records that "may be withheld from inspection and copying" and section 38-33.3-317(3.5) identifies two categories of records that "are not subject to inspection and copying" and "must be withheld." An association's bank statements are not listed in either subsection. And although section 38-33.3-317(3.5)(b)(I) prohibits an association from disclosing "[p]ersonal identification and account information *of members and residents*, including bank account information," it is silent as to *the association's* bank account information. (Emphasis added.)

¶ 21　To be sure, personal bank account information belonging to an individual member is not one of the eighteen categories of records identified in subsection (1). *See* § 38-33.3-317(1). Yet documents containing such information may fall within one of the eighteen categories, such as (1)(a). Recognizing this, the legislature specifically exempted individual members' bank account information from inspection and disclosure. Because it did not do the same for an association's bank account information, it must not

13

have intended those bank statements to be exempt. *See Reale v. Bd. of Real Est. Appraisers*, 880 P.2d 1205, 1207 (Colo. 1994) (under the maxim "expressio unius est exclusio alterius," "the expression of one thing is the exclusion of another").

¶ 22    Third, interpreting subsection (1)(a) to include an association's bank statements does not render any other category of record superfluous. HGA points us to subsections (1)(g) and (1)(j), arguing that "[i]f, as Seaman claims, [subsection (1)(a)] covers all documents related to 'money coming in and going out of the association,'" subsections (1)(g) and (1)(j) would be unnecessary. True, we avoid constructions that would render any words or phrases superfluous. *See McBride v. People*, 2022 CO 30, ¶ 23. But we are not convinced that the records identified in subsections (1)(g) and (1)(j) necessarily constitute "[d]etailed records of receipts and expenditures affecting the operation and administration of the association." § 38-33.3-317(1)(a).

¶ 23    Section 38-33.3-317(1)(g) requires an association to maintain "[f]inancial statements as described in section 7-136-106, C.R.S. [2023], for the past three years." Section 7-136-106 provides that, "[u]pon the written request of any member, a nonprofit corporation

14

shall mail to such member its most recent annual financial statements, if any, and its most recently published financial statements, if any, *showing in reasonable detail its assets and liabilities and results of its operations.*" (Emphasis added.) The financial statements contemplated by section 38-33.3-317(1)(g) are those reflecting the association's overall financial condition by reporting its assets and liabilities. *See* Black's Law Dictionary 775 (defining "financial statement" as "[a] balance sheet, income statement, or annual report that summarizes an individual's or organization's financial condition on a specified date or for a specified period by reporting assets and liabilities"). But a snapshot of an association's assets and liabilities is not likely to include "[d]etailed records of receipts and expenditures." § 38-33.3-317(1)(a). For example, a financial statement might reflect that an association has $100,000 in a bank account as an asset, but it would not show the transactions in and out of that account (the receipts and expenditures) resulting in the end balance.

¶ 24    Section 38-33.3-317(1)(j) requires an association to maintain "[f]inancial records sufficiently detailed to enable the association to

15

comply with section 38-33.3-316(8)[, C.R.S. 2023,] concerning statements of unpaid assessments." Section 38-33.3-316(8), in turn, requires an association to furnish to a unit owner "a written statement setting forth the amount of unpaid assessments currently levied against such owner's unit." A record that satisfies section 38-33.3-317(1)(j) would reflect amounts a unit owner has been assessed but has not paid — amounts an association has *not* received — so it would not reflect either "receipts" or "expenditures" of the association, which is what section 38-33.3-317(1)(a) requires. Moreover, it makes sense that the legislature would take care to separately list a record an association must maintain to be able to comply with another of its statutory obligations under CCIOA.

¶ 25    HGA also argues that the bank statements Seaman requested are not, as a matter of fact, the type of records contemplated by section 38-33.3-317(1)(a) because they do not show "receipts" or "expenditures." More specifically, HGA asserts that it did not receive the PPP funds directly into the KeyBank account; rather, the funds were deposited into its operating account and then transferred to the KeyBank account. Similarly, HGA asserts that it did not expend any PPP funds directly from the KeyBank account;

16

rather, it transferred funds from the KeyBank account into its operating account. It is unclear to us whether any of the PPP funds were ever expended, from either the KeyBank account or HGA's operating account. In any event, we are not able to confirm these assertions because the bank statements were not produced and are not part of the record on appeal.

¶ 26 But more importantly, these are factual issues that cannot be resolved in HGA's favor on a C.R.C.P. 12(b)(5) motion. *Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1088 (Colo. 2011) ("We uphold the grant of a C.R.C.P. 12(b)(5) motion to dismiss only when the plaintiff's factual allegations do not, as a matter of law, support the claim for relief."). Although Seaman alleged that the records he did receive from HGA showed transfers of PPP funds between the KeyBank account and HGA's operating account, he did not allege that those were the sole transactions on the KeyBank account or that the PPP funds were not received into or expended from the KeyBank account. Nor can we so conclude as a matter of law.

¶ 27 For these reasons, we conclude that the district court erred when it determined, as a matter of law, that the bank statements Seaman requested did not fall within section 38-33.3-317(1)(a).

## C. Records Generated by Third Parties May Be Maintained by an Association

¶ 28    HGA also contends that section 38-33.3-317(1) does not require an association to maintain or make available records "created by an outside party, such as a bank."  Because subsection (1) obligates an association to "maintain" certain records, and subsection (2) requires that "all records maintained by the association" be made available for inspection and copying, we understand HGA to argue that records generated by third parties are not records "maintained" by an association.[7]  We reject this contention for three reasons.

¶ 29    First, several of the eighteen categories of records an association is obligated to maintain are records an association is unlikely to generate itself.  For example, "[r]ecords of claims for construction defects" may include demand letters and complaints asserting claims for construction defects, which are likely to be drafted by the association's legal counsel.  § 38-33.3-317(1)(b).  Similarly, "[t]he association's most recent reserve study" may have

---

[7] HGA does not argue, and the record does not reveal, that it does not have copies of or lacks reasonable access to its bank statements.

18

been prepared by a professional reserve study company or an outside expert. § 38-33.3-317(1)(k). Thus, the fact that a third party generates a record cannot mean that an association does not "maintain" it.

¶ 30 Second, excluding records created or kept by third parties from those an association is obligated to produce would frustrate the purpose of section 38-33.3-317 and lead to absurd results. *See AviComm, Inc. v. Colo. Pub. Utils. Comm'n*, 955 P.2d 1023, 1031 (Colo. 1998) ("[A] statutory interpretation that defeats the legislative intent or leads to an absurd result will not be followed."). Under HGA's interpretation, an association that creates its own records would be required to produce them to unit owners while an association that outsources the preparation of its records — likely a larger association able to afford such professional services — would be able to avoid that same obligation. Such a result would be inequitable and contrary to the clear purpose of section 38-33.3-317, which is to provide unit owners with reasonable access to information about the operation and administration of an association. Because we must presume the legislature intended a just and reasonable result, *see AviComm, Inc.*, 955 P.2d at 1031, we

reject any construction of the statute that conditions an owner's right to access an association's records on whether an association had a third party prepare them.

¶ 31    Third, we are persuaded that an association must make records generated by a third party available to unit owners by reference to a public entity's obligations under the Colorado Open Records Act (CORA).  Just as CCIOA entitles unit owners to inspect certain association records, CORA entitles members of the public to inspect public records.  *See* § 24-72-201, C.R.S. 2023 ("[A]ll public records shall be open for inspection by any person at reasonable times," except as otherwise provided by law.).  "Public records" include "all writings *made, maintained, or kept* by" a public entity "for use in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds."  § 24-72-202(6)(a)(I), C.R.S. 2023 (emphasis added).

¶ 32    On several occasions, Colorado courts have concluded that records created by or in the possession of third parties nonetheless constitute public records that must be made available to the public. *See Leonard v. Interquest N. Bus. Improvement Dist.*, 2022 COA 78, ¶¶ 18-19 (documents that a public entity has a "contractual right to

access" from a third party constitute public records it must make available for inspection); *Int'l Bhd. of Elec. Workers Loc. 68 v. Denver Metro. Major League Baseball Stadium Dist.*, 880 P.2d 160, 164 (Colo. App. 1994) (documents not "made or kept" by the public entity, but to which the public entity had "full access" were public records); *see also Denver Post Corp.*, 255 P.3d at 1091 ("maintaining" a record includes "taking steps to ensure the physical integrity of the document, updating the information it contains, or directing another to do the same"); *Zubeck v. El Paso Cnty. Ret. Plan*, 961 P.2d 597, 600-01 (Colo. App. 1998) (concluding that the plaintiffs should have been given access under CORA to the retirement plan's financial records, including its bank statements).

¶ 33 In the end, we conclude that the district court erred by dismissing Seaman's complaint under C.R.C.P. 12(b)(5). The bank statements Seaman requested may be records HGA is obligated to maintain and produce to him under section 38-33.3-317(1)(a) and (2). Whether the bank statements in fact reflect "receipts and expenditures affecting the operation and administration of the association," § 38-33.3-317(1)(a), is a factual question that cannot be resolved against Seaman at this stage of the proceedings. *See*

*Denver Post Corp.*, 255 P.3d at 1083 ("We accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff."). Seaman's claim must be reinstated.

## III.     Attorney Fees and Costs

¶ 34     In the district court, HGA requested and was awarded attorney fees and costs pursuant to section 38-33.3-123(1)(c), C.R.S. 2023. Under that provision, the prevailing party in any action to enforce or defend the provisions of CCIOA is entitled to reasonable attorney fees and costs. But because there has been no resolution on the merits, there is not yet a prevailing party. *See DeJean v. Grosz*, 2015 COA 74, ¶¶ 44-45; *see also* C.R.C.P. 54(d). Accordingly, we reverse the district court's order awarding HGA its attorney fees and costs. And for the same reason, we decline to award appellate attorney fees to either party.

## IV.     Disposition

¶ 35     We reverse the district court's judgment and its order awarding attorney fees and costs to HGA, and we remand for further proceedings consistent with this opinion.

JUDGE TOW and JUDGE SCHOCK concur.